[No. S021683. Jan. 29, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD ANTHONY JONES, Defendant and Appellant.

**COUNSEL**

Marilee Marshall, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Robert S. Henry and Allison H. Ting, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant, convicted of murdering Lois Anne Haro following sexual offenses and other felonies against her, was sentenced to death and awaits execution at San Quentin prison.

The district attorney filed an information on April 28, 1989, charging defendant, in count 1, with murder (§ 187, subd. (a); this and all unlabeled statutory references are to the Penal Code). Count 2 charged kidnapping for the purpose of robbery (§ 209, subd. (b)), count 3 second degree robbery (§ 211, former § 212.5, subd. (b) (Stats. 1987, ch. 801, § 1, p. 2509), count 4 forcible rape while acting in concert (§ 264.1), and count 5 forcible oral copulation (§ 288a, subd. (c)).

The information also alleged four felony-murder special circumstances (§ 190.2, subd. (a)(17))—i.e., that defendant killed while or during "the immediate flight after" (*ibid.*) committing robbery (§ 211), kidnapping (§§ 207, 209), rape (§ 261), and oral copulation (§ 288a). And it alleged that he used a firearm (§ 12022.5) to kill Haro and, with regard to the murder, kidnapping for robbery, and second degree robbery counts, that a principal was armed with a firearm (§ 12022, subd. (a)), namely a handgun.

A jury convicted defendant of all offenses, and found true all the allegations. Following a penalty trial, it returned a verdict of death on the murder count, and the court entered judgment accordingly, also imposing a five-year enhancement for shooting Haro and an additional one-year term because a principal was armed with a gun.

On the other counts, the court sentenced defendant to life imprisonment without possibility of parole for kidnapping for robbery, five years for second degree robbery, nine years for forcible rape while acting in concert, and eight years for forcible oral copulation. It ordered all these sentences to run consecutively except for the second degree robbery term, which it stayed under section 654.

## FACTS

A police officer on patrol on the evening of October 18, 1988, discovered Lois Anne Haro lying in the dirt bordering an isolated road in Pasadena. She died on the way to the hospital. The cause of death was a gunshot wound to the head. A criminalist located semen on Haro's clothing and on vaginal, rectal, and external genital samples taken with a sexual assault kit. Defendant could have left the semen found on the vaginal and external genital samples.

The police apprehended defendant the morning after the crimes after seeing him park Haro's car. When booking him after an initial interrogation they found her credit cards, her automated teller machine card, and the key to her husband's car. They resumed the interrogation that afternoon and

defendant made other statements to them in the following days. In his statements, he declared that he and his partner, George Marvin Trone, Jr., abducted Haro at gunpoint from a Pasadena shopping mall where she was buying baby gifts and, while driving from place to place, committed various sexual offenses against her, including three forcible rapes and one act of forcible oral copulation. This attack lasted for about an hour and ended when defendant shot and mortally wounded her. The police learned the latter fact two days after defendant's arrest when he volunteered to them that he had shot Haro, a fact he had initially denied. He later acknowledged in court committing all of the crimes, including aiding and abetting Trone's forcing Haro to orally copulate him, a crime for which no physical evidence had been found but that was charged on the basis of prior confessions.

Although defendant admitted committing the crimes, he disputed his role. Notwithstanding his confession to the police, he denied being the shooter. Thus the only major fact at issue at the guilt phase was whether he or Trone shot and mortally wounded Haro. Defendant testified that he aided Trone in Haro's kidnapping for robbery, robbery, forcible rape, and forcible oral copulation. He also testified to personally raping Haro, but claimed that he did not personally rob her. He expressed remorse for his acts.

As stated, the jury found that defendant shot Haro.

Defendant further testified that he did not try to gain access to Haro's bank account after her death. In rebuttal, the prosecution introduced evidence that the morning after Haro was killed, someone tried, without success, to use her automated teller machine card to withdraw money from her bank account.

Defendant did not testify at the penalty phase. The prosecution introduced evidence of a beating of a high school classmate that may have caused a miscarriage. For this offense he admitted to misdemeanor battery in juvenile court. On his behalf, friends, relatives, and a former teacher gave evidence of good character traits.

Defense counsel acknowledged in closing argument that the circumstances of the crime were the worst factor in aggravation. Guilt phase evidence that the police found Haro's gift of baby items in her car after the crimes would have emphasized her vulnerability to the jury. And the jury could have concluded from defendant's own guilt phase testimony that he committed the crimes remorselessly—he testified that after kidnapping, raping and helping to kill Haro he went home, enjoyed watching the situation comedy *The Honeymooners* on television, and ate a late dinner.

But defense counsel nevertheless argued that there was lingering doubt whether defendant or Trone was the shooter; that he had good qualities that justified an exercise of mercy; that he had turned down a plea bargain offer for life imprisonment without possibility of parole; and that even if jurors did not believe he deserved mercy, they could impose a sentence of life imprisonment without possibility of parole as the more severe punishment.

## DISCUSSION

### *Jury Selection Issues*

#### *Claim of Improper Use of Peremptory Challenges*

Defendant, who is African-American, contends that the prosecutor improperly exercised peremptory challenges to exclude all four Black prospective jurors. He claims that this procedure violated the state Constitution's implicit guaranty of a representative jury, as explained in *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748], and, in the federal Constitution, the Fourteenth Amendment's equal protection and Sixth Amendment jury trial provisions. (See generally, *People v. Alvarez* (1996) 14 Cal.4th 155, 192-193 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

Three times defendant objected to the peremptory challenges and moved for a mistrial under *Wheeler*. The trial court specifically declared that it found no prima facie evidence of discrimination, and it denied the motions. But it invited the prosecutor to explain informally any reasons for his actions. The prosecutor explained that he challenged Emery H. because he gave conflicting and possibly untrue answers about whether he had followed the case in the newspapers. He could not recall the reason for his challenge to Doris C., except that it was "based upon her answers in her questionnaire and her answers in [individual voir dire] and her attitudes with respect to the death penalty as she expressed [them then]." He challenged Edna A. because she opposed the death penalty on religious grounds. And he challenged Joseph S. because he had earlier stated that realistically he could not impose the death penalty and the prosecutor felt "that these were his true feelings." "I don't think he can vote for death."

The prosecutor stated that he regretted having to challenge Joseph S., that he was "very conscious of the image that this might be creating," and that he wished "that I had Black jurors on this panel that I felt could impose the death penalty under any circumstances or any evidence presented in this case."

We review a trial court's ruling on a motion of this type for substantial evidence. (*People v. Alvarez, supra,* 14 Cal.4th at p. 196.) "A

party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing of strong likelihood that the opponent has excluded one or more jurors on the basis of group or racial identity." (*People* v. *Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) The court found that there was no showing of such behavior at all, and we examine the record to determine whether evidence supported this finding. " ' "Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal." ' " (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 117 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We also bear in mind that peremptory challenges are not challenges for cause—they are *peremptory*. We have said that such challenges may be made on an "apparently trivial" or "highly speculative" basis. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 275.) Indeed, they may be made " 'without reason or for no reason, arbitrarily and capriciously' " (*People* v. *Williams* (1997) 16 Cal.4th 635, 663 [66 Cal.Rptr.2d 573, 941 P.2d 752]).

 The record reveals evidence to support the court's rulings.

Emery H. did give conflicting and possibly untrue answers to questions whether he had followed the case in the media. We note that he volunteered the statement that he had read about the case. Still, it did contradict the response on his questionnaire. Moreover, Emery H. said that he knew "a lot of Jones[es] in Pasadena" and couldn't "say whether I know any members of [defendant's] family"; he "wouldn't know" unless he saw them.

Prospective juror Doris C. showed hostility toward the death penalty in principle and to the prosecution's questioning. She acknowledged that she thought the penalty was implemented too often in the United States. When asked why, she replied, "It's just how I feel. I mean, what are you trying to pull from me?" She implied that the penalty is meted out to people later found to be innocent.

Edna A. agreed with the prosecutor "that California should not have a death penalty law because the Bible says we should not kill."

During voir dire to ascertain Joseph S.'s willingness to impose the death penalty, the prosecutor had told him the parties were trying "to determine your really true thoughts on this and whether you could ever do it. [¶] I'm not asking you if you could be fair. I'm asking you if you could really weigh the evidence and, under any set of facts, could you ever return a death verdict, realistically?" Joseph S. answered "No." Something in Joseph S.'s demeanor evidently was troubling the prosecutor even before this negative

answer, for he hesitated or equivocated in answer to other questions and the prosecutor, to remind him of the gravity of his role, commented that "you may not have faced what we're really talking about yet emotionally. That is, we're putting the defendant's life in your hands . . . ."

As stated, the trial court found no impermissible bias in the prosecutor's decisions. A fortiori, therefore, it found no strong likelihood of such bias. As alluded to, our review of the record satisfies us that there was evidence to support the rulings. There was no error.

Defendant contends in substance that bias may be found in that other prospective jurors, evidently not Black, had expressed doubts about the death penalty but were impaneled anyway. The implication is that the Black prospective jurors were singled out for special scrutiny. On this record, however, we are constrained to disagree. There is evidence to support the court's rulings on the four Black prospective jurors in question, enough to reject defendant's claims of *Wheeler* error.

*Guilt Phase Issues*

*Voluntariness of Defendant's Confession*

As mentioned, defendant confessed or admitted to the crimes and provided details regarding them in several different conversations with the police, which occurred on the day of his arrest, the next day, and the day after that. Before each conversation, except for one that he initiated in a police car, he was given or reminded of his rights to silence and to counsel (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]).

Specifically, on the day of the arrest defendant was interrogated in a session that was interrupted by lunch. In that two-stage session, he confessed or admitted to either committing and/or aiding and abetting murder, kidnapping, rape, and oral copulation, but denied shooting Haro.

The next day defendant initiated a conversation in which he told the police he was concerned that a gunshot residue test might erroneously show that he had fired the gun. In a second conversation that day, initiated at the district attorney's request, he explained further some of the preliminary events at the shopping mall, and admitted that Trone had robbed Haro of money, two rings, and her watch as defendant drove the car.

The day after that, defendant made two statements. The first, which he initiated, he gave in a police car on the way to a hospital where he was to

undergo medical tests. He volunteered to tell the police "the truth," which was that he and Trone "were in the car to get rid of her." He stated that Trone was pointing the gun, which was cocked, at Haro, that he (defendant) grabbed it and it discharged, evidently by accident: "My hand slipped into the gun." As mentioned, the record does not show that the police reminded defendant of his constitutional rights during this conversation.

It was during defendant's final confession, volunteered after his arrival at the hospital, that he changed his story and admitted he had personally shot Haro. At the hospital, after reminding defendant of his constitutional rights, a police detective said he didn't believe his story. The detective testified that defendant "put his head down, bowed his head down, and said, 'Okay, I shot her.'"

Defendant asserted before and during trial that he made his statements involuntarily. He moved unsuccessfully to have the information set aside as a result (§ 995) and to have the statements excluded under Evidence Code section 405. He renewed the latter motion at trial, also without success. He contends that the court erred when it denied the motions, violating his rights under the due process clause of the Fourteenth Amendment to the United States Constitution and its equivalent in article I, section 15 of the California Constitution (hereafter the due process clauses).

"What the Constitution permits to be admitted in evidence is 'the product of an essentially free and unconstrained choice . . .' to confess. [Citation.] The question is whether defendant's choice to confess was not 'essentially free' because his will was overborne." (*People* v. *Memro* (1995) 11 Cal.4th 786, 827 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) The People bore the burden, by a preponderance of the evidence, of showing that the statements were made voluntarily. (*People* v. *Ray* (1996) 13 Cal.4th 313, 336, fn. 10 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Resolving the point requires considering "a mixed question of law and fact that is nevertheless predominantly legal . . . ." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84].) Hence " '[o]n appeal, the determination of a trial court as to the ultimate issue of the voluntariness of a confession is reviewed independently . . . . [¶] The trial court's determinations concerning whether coercive police activity was present, whether certain conduct constituted a promise and, if so, whether it operated as an inducement, are apparently subject to independent review as well.' [Citation.] However, 'the trial court's findings as to the circumstances surrounding the confession— including "the characteristics of the accused and the details of the interrogation" [citation]—are clearly subject to review for substantial evidence. . . . .' " (*People* v. *Memro, supra,* 11 Cal.4th at p. 826.)

First, defendant contends that the statements he made on the day of his arrest were elicited involuntarily because an interrogator improperly induced them by promises of leniency, by deception, and by threats of adverse consequences if he failed to confess. (See *People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) He emphasizes what he perceives as improper offers of leniency.

The trial court ruled before trial on defendant's section 995 motion that "beyond a preponderance of the evidence . . . each statement . . . was voluntary and admissible." It specifically found no coercion, nor any improper promise of leniency. It characterized the questioning as "low-key" and "nonthreatening." It further ruled that even if any improper implied promise of leniency was made, it "was not, and could not have been, the motivating cause of any confession or admission. There are numerous other factors that would constitute a motivating cause . . . ." And it ruled that "any subterfuge . . . by the police [was] not likely to induce an innocent person to falsely confess to a crime," so that it was "within legal limits."

Commenting on the interrogations' success in eliciting damaging information, the trial court concluded, "There is no constitutional right to a clumsy or inexperienced questioner."

The court reaffirmed the substance of this ruling in a later pretrial hearing in which it evidently decided defendant's motion under Evidence Code section 405—the record is not clear on the procedural posture of this later ruling. And it denied a motion at trial to suppress the statements.

Defendant asserts in sum that although his interrogator told him he could make no promises regarding the decisions the district attorney would make in his case, he said that he would intercede with the district attorney on defendant's behalf, telling the district attorney that defendant had been honest. He maintains that his questioner falsely implied that such an intercession would generate leniency. He also asserts that the police deceived him by implying that they had superior knowledge of the crimes and that it would be best for him to confirm facts they already knew, when in fact they did not know them.

The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means. "[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof." (Rothwax, Guilty: The Collapse of Criminal Justice (1996) p. 103.) "The courts have prohibited only those psychological

ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People* v. *Ray*, *supra*, 13 Cal.4th at p. 340.) ▮ In this case the prosecution met its burden of proving that there was nothing improper about the interrogations on the day of defendant's arrest. During the morning interrogation defendant strove to minimize his role in the crimes. Even after being booked, when it became more apparent that he was liable to severe punishment for serious crimes, he continued to maintain, in the afternoon interrogation, that he did not shoot Haro. The investigators did not know the full extent of what he had done. We agree with the People that in such circumstances, the detective's offers of intercession with the district attorney amounted to truthful implications that his cooperation might be useful in later plea bargain negotiations. (See *People* v. *Groody* (1983) 140 Cal.App.3d 355, 359 [189 Cal.Rptr. 467].) Defendant himself acknowledged that he understood the terms of the questioning. Asked "OK, did we make you any promises that we were going to give you an easy time or anything if you talk to us[?]" he responded: "Nope. You just promised that you'll go over and talk to the District Attorney and tell 'em . . . (inaudible)[.]"

Defendant contends that this acknowledgment was not freely given; it was "simply part of the 'cooperation' that was demanded by the officers." (*People* v. *Denney* (1984) 152 Cal.App.3d 530, 544 [199 Cal.Rptr. 623].) We perceive no such quality in the above quoted exchange. In the course of an interrogation the trial court found "low-key" and "nonthreatening," defendant's reply does not appear to have been coerced. (Cf. *ibid.*)

At one point defendant's interrogator told him that "the truth is going to set you free." We understand this exhortation, paraphrasing a verse in the Gospel According to John (John 8:32), not to promise leniency, but to suggest that telling the truth would relieve defendant of a psychological burden. Because it can be misunderstood, we do not approve of such an exhortation. But we cannot find error in these circumstances: Defendant had waived his rights to silence and to counsel and was speaking freely.

Nor were there any threats. Defendant argues that persistent references to the dire consequences he was facing forced him to speak. To be sure, the detective told him that his answers could affect the rest of his life. This was true. But we see no indication that defendant was frightened into making a statement that was both involuntary and unreliable. Defendant even volunteered that he was "pretty relaxed" at the beginning of the afternoon interrogation. The transcript reveals that there was no coercion. Indeed, defendant felt free not to acknowledge facts of which he claimed to have no knowledge. Near the end of the session, he said, "Those are the two

questions that I would not be able to answer if my life depended on it. . . ." His statement was not challenged and the interview ended.

Nor did the detective's deceptive statements offend any constitutional guaranty. The detective implied at various times that he knew more than he did or could prove more than he could. Such deception regarding the evidence was permissible, for it was not " 'of a type reasonably likely to procure an untrue statement.' " (*People* v. *Thompson* (1990) 50 Cal.3d 134, 167 [266 Cal.Rptr. 309, 785 P.2d 857].) In sum, the prosecution met its burden of proof to show the statements were voluntary.

Defendant also contends that because his initial interrogations produced involuntary incriminating statements, his subsequent inculpatory statements were illegally obtained. ██ █ But the initial interrogations did not produce any involuntary incriminating statements.[1]

### Failing to Establish Corpus Delicti of Oral Copulation

 Defendant contends that the trial court erred by denying his motion to set aside the information under section 995 or to enter a judgment of acquittal for insufficient evidence under section 1118.1 on the grounds that the corpus delicti of oral copulation was not established. We review the ruling under section 995.[2]

---

[1] Defendant also asserts that the court should have suppressed his statements because the police unreasonably delayed his appearance in court, in violation of former section 825 (Stats. 1961, ch. 2209, § 1, p. 4554) and of the right to a speedy trial (U.S. Const., Amends. VI, XIV; *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 147-148 [88 S.Ct. 1444, 1446-1447, 20 L.Ed.2d 491]; Cal. Const., art. I, § 15), and because he was not readvised of his rights under *Miranda* v. *Arizona*, *supra*, 384 U.S. 436, before engaging in a later conversation with the police, a lapse that he evidently claims violated the due process clauses.

The People respond that defendant abandoned these claims by failing to present them to the trial court. We agree. Defendant acknowledges that he never directly raised the points in the trial court. He asserts that he incorporated them by what we perceive as an oblique and general reference to points made at the preliminary hearing in a supplemental motion in the trial court to set aside the information (§ 995). That, however, was insufficient to alert that court or the prosecutor to the issues he now raises here. He did not preserve them for appeal. As the People assert, "it would be wholly inappropriate to reverse a superior court's judgment for error it did not commit and that was never called to its attention." (*People* v. *Lilienthal* (1978) 22 Cal.3d 891, 896 [150 Cal.Rptr. 910, 587 P.2d 706].)

[2] The People contend as a preliminary matter that defendant's motion for judgment of acquittal did not raise the corpus delicti issue. The record supports their view.

The record shows that counsel made an oral motion to acquit on all charges "based on insufficiency of the evidence." There is no mention during the argument on this motion of the corpus delicti rule. Arguing specifically regarding the charge of oral copulation and the related special circumstance allegation, counsel stated: "[W]e have no evidence at all from any source that [defendant] personally participated in any act of oral copulation. We have a

During his interrogation the day after Haro's murder, defendant stated that Trone had forced her to orally copulate him in the backseat of the car while defendant drove. Accordingly the felony complaint filed October 21, 1988, in Pasadena Municipal Court charged defendant, evidently as an accomplice, with one count of forcible oral copulation; it also alleged a felony-murder special circumstance on that basis. At the preliminary hearing the magistrate heard argument "on the objection based on the lack of corpus [delicti] with respect to two of the special circumstances[,] that being the rape and the oral copulation." The prosecutor argued that he had established the corpus delicti for both counts and both special circumstance allegations, but conceded that "it is a closer question with respect to the oral copulation special circumstance and the oral copulation count." Defense counsel replied, "with regard to the oral copulation and the count involving oral copulation there is absolutely no evidence, independent of the statements[,] . . . which would establish these allegations." "None of the elements of [section 288a, subdivision (c)] are present in this record. Not one independent of the statements of the defendants."

The magistrate determined at the preliminary hearing that the prosecution had not established the corpus delicti of oral copulation. Perhaps relying on a holding (not under review here) that the corpus delicti must be established at a preliminary examination "before a defendant may be held to answer in the superior court . . ." (*Jones* v. *Superior Court* (1979) 96 Cal.App.3d 390, 393 [157 Cal.Rptr. 809]; see also §§ 871, 872), the magistrate did not order that defendant be held to answer the oral copulation charge or special circumstance allegation in superior court. Nevertheless the information filed in superior court alleged an oral copulation offense and special circumstance.

The magistrate acknowledged that "under the circumstances of this particular case, and any case similar to it, the People are hard-pressed to be able to present a corpus of an oral copulation. The court is not unmindful of that." But he ruled that the law required a finding that the prosecution had not established the corpus delicti of oral copulation.

The trial court had a different view. Applying a rule that "only a slight showing" of evidence need be made to establish the corpus delicti, it found,

precise denial of that, which I think has a certain probative force because it comes attached to an admission of rape." As is clear, counsel was not arguing that defendant's extrajudicial statements were inadmissible because of the corpus delicti rule. To the contrary, he argued that the trial court should believe defendant's statement that he did not participate in the oral copulation because another part of the same statement (specifically, his admission to raping the victim) indicates that he probably told the truth when he denied the oral copulation. Because counsel expressly relied on this extrajudicial statement to make the acquittal motion, he was not making a corpus delicti argument. Accordingly, that claim is not cognizable on appeal.

on the basis of "the transcripts of the preliminary hearing and evidence admitted at such hearing," that "[a]mong other things, there is extensive evidence indicating various sexual acts were perpetrated against the victim. Defendant's statements, highly corroborated by other evidence in other areas, can then be used to strengthen the evidence on the issue of oral copulation once the threshold is met, which I find was met in this case." Citing *People* v. *Robbins* (1988) 45 Cal.3d 867 [248 Cal.Rptr. 172, 755 P.2d 355], the court denied the motion under section 995.

■ We explained the standard of appellate review of a trial court's ruling on a section 995 motion in *People* v. *Laiwa* (1983) 34 Cal.3d 711 [195 Cal.Rptr. 503, 669 P.2d 1278]. "[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation.]·On review by appeal . . . the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer." (*Id.* at p. 718.)

■ " ' "The corpus delicti of a crime consists of two elements[:] the fact of the injury or loss or harm, and the existence of a criminal agency as its cause." ' " (*People* v. *Zapien* (1993) 4 Cal.4th 929, 985-986 [17 Cal.Rptr.2d 122, 846 P.2d 704].) "In any criminal prosecution, the corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or admissions of the defendant." (*People* v. *Wright* (1990) 52 Cal.3d 367, 403 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Diaz* (1992) 3 Cal.4th 495, 528-529 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (lead opn.); accord, *id.* at p. 577 (conc. and dis. opn. of Mosk, J.); *People* v. *Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009].) Such independent proof may consist of circumstantial evidence (*Jennings*, *supra*, at p. 364; *People* v. *Alcala* (1984) 36 Cal.3d 604, 624 [205 Cal.Rptr. 775, 685 P.2d 1126], and need not establish the crime beyond a reasonable doubt (*Diaz*, *supra*, at p. 529; *Wright*, *supra*, at p. 404).

The purpose of the corpus delicti rule is to assure that "the accused is not admitting to a crime that never occurred." (*People* v. *Jennings*, *supra*, 53 Cal.3d at p. 368.) The amount of independent proof of a crime required for this purpose is quite small; we have described this quantum of evidence as "slight" (*id.* at p. 364) or "minimal" (*id.* at p. 367). The People need make only a prima facie showing " 'permitting the reasonable inference that a crime was committed.' " (*Id.* at p. 364, quoting *People* v. *Alcala*, 36 Cal.3d *supra*, at pp. 624-625.) The inference need not be "the only, or even the most

compelling, one . . . [but need only be] a *reasonable* one . . . ." (*Jennings, supra*, at p. 367.)

As we explain, the People made such a showing in this case. The critical evidence supporting the corpus delicti was essentially the same at both the preliminary examination and at trial. Haro was found some 10 feet from the roadway on a dirt median. She had been shot in the head and was alive when found, but died shortly thereafter. Medical experts found bruises on her thighs, knees, legs, and perineal area. She also exhibited injuries on her hands. Results from the sexual assault kit revealed the presence of semen inside her vagina, on her external genitalia, and in her rectal area. No trace of semen was found in Haro's mouth; an expert testified, however, that negative test results were not inconsistent with oral copulation because the mouth's natural rinsing processes eliminate semen. Haro was not wearing underpants, a brassiere, or shoes. Evidence showed she customarily wore such clothing.

As the facts are undisputed, in this case we are faced only with the legal question of whether there was sufficient evidence to establish the corpus delicti of oral copulation. Section 288a, subdivision (a), defines this crime as "the act of copulating the mouth of one person with the sexual organ or anus of another person."

Keeping in mind the low threshold of proof required to satisfy the corpus delicti rule, we conclude that the magistrate erred in finding this low threshold was not met by the evidence presented at the preliminary examination. The state of the victim's clothing (no underwear or shoes) and the forensic evidence (semen in the victim's vagina and on her external genitalia and anus) indicates multiple sexual acts occurred. That the victim was forcibly abducted, beaten, shot in the head, and left by the side of the road for dead gives rise to an inference that the sexual activity that occurred was against the victim's will. This circumstantial evidence of multiple forcible sexual acts sufficiently establishes the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency.

Defendant, however, contends that the prosecution failed to establish the corpus delicti of oral copulation because no semen was found in the victim's mouth. In other words, he argues that the lack of evidence of the *specific* loss or harm to this victim is fatal to the establishment of the corpus delicti. The law's requirements, however, are not so strict. Two previous cases involving application of the rule to a charged sexual assault are illustrative. In *People v. Jennings, supra*, 53 Cal.3d 334, the body of the victim, a known prostitute, was found in an irrigation canal in a rural area. She was unclothed, and

although forensic examination detected she had suffered a broken jaw, the advanced decomposition of her body made determining whether she had been sexually assaulted impossible. More specifically, there was no independent evidence that the defendant ever sexually penetrated the victim. (See § 263 ["Any sexual penetration, however, slight, is sufficient to complete the crime [of rape]."].)

Despite the absence of any independent evidence of sexual penetration, we found that the trial court properly admitted evidence of the defendant's extrajudicial statement that he had raped the victim before killing her. Although we characterized the independent evidence of rape as " 'thin' " (*People* v. *Jennings*, *supra*, 53 Cal.3d at p. 369), we nevertheless concluded that the unclothed condition of the victim's body, its location when found, and the evidence of a broken jaw, considered together, were sufficient to establish the corpus delicti of rape.

*People* v. *Robbins*, *supra*, 45 Cal.3d 867, is in accord. The evidence in *Robbins* showed that the victim, a six-year-old boy, was last seen riding on a motorcycle with an unknown blond man. The boy's skeletal remains were found three months later. The victim's neck had been broken and his body was found unclothed. The defendant had been diagnosed as a pedophile. Although the decomposed remains of the victim could not establish whether he had been sexually assaulted before his death, the defendant made an extrajudicial admission that he abducted the victim and sexually assaulted him before strangling him. We found the trial court properly admitted this confession over a corpus delicti objection. (*Id.* at pp. 885-886.) "In view of the nature of the offense and the circumstances of the case (i.e, the body was not discovered for some time, hence it was impossible to verify the sexual conduct by scientific evidence, and there were apparently no eyewitnesses to the crime) we do not believe the corpus delicti rule can be interpreted to call for more; the law does not require impossible showings." (*Id.* at p. 886.)

*People* v. *Jennings*, *supra*, 53 Cal.3d 334, and *People* v. *Robbins*, *supra*, 45 Cal.3d 867, require a similar result in the instant case. In all three cases, the victim's body was found unclothed (or partially clothed) in a location and condition suggesting the involvement of a criminal agency. In all three cases, independent evidence of a certain element of a sexual crime was lacking: penetration necessary for rape in *Jennings*, a touching of a child with lewd intent in *Robbins*, oral-genital or oral-anal contact in this case. As *Jennings* and *Robbins* demonstrate, we have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved.

We conclude that there was sufficient evidence to sustain the court's ruling that the prosecution met its burden. Because we so decide, we do not address the issue, on which we solicited supplemental briefing, whether article I, section 28, subdivision (d) of the California Constitution abrogated the corpus delicti rule. (*People* v. *Riccio* (1996) 42 Cal.App.4th 995, 1001, fn. 5 [50 Cal.Rptr.2d 52] [because court found corpus delicti rule satisfied, it "need not consider whether or not the corpus delicti rule has been abrogated"]; see *People* v. *Culton* (1992) 11 Cal.App.4th 363, 373-377 [14 Cal.Rptr.2d 189] (conc. opn. of Timlin, J.).)

Finally, defendant contends that permitting the charge and allegation of oral copulation to proceed to the jury violated the due process clauses. He presents this claim perfunctorily and without supporting argument, and we reject it in similar fashion.

*Excluding Evidence of Trone's Character for Violence*

Defendant moved to admit evidence from three witnesses who would testify to past statements and criminal activity by Trone. Defendant maintained that such evidence was relevant to deciding whether Trone or defendant was the person who actually pulled the trigger of the gun that killed Lois Haro. After hearing argument, the trial court ruled the proffered evidence was barred by the statutory prohibition on character evidence (Evid. Code, § 1101), that the evidence was not relevant, and that even if relevant, the evidence was properly excludable under Evidence Code section 352.

 Defendant now contends the trial court erred in making these rulings, thereby depriving him of the ability to mount a defense in violation of his federal right to due process of law.

We need not address the relevance or character evidence issues, for the ruling under Evidence Code section 352 is supportable. We will not disturb a trial court's exercise of discretion under Evidence Code section 352 " '*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Because the evidence proposed by defendant would delve deeply into Trone's past, and because Trone was being tried separately, the trial court did not abuse its discretion in concluding that the evidence would require an undue consumption of time and mislead the jury.

Having concluded the trial court's decision excluding the proffered evidence was supportable, we further reject defendant's claim that the trial

court's decision violated his rights under the federal Constitution. The essence of his claim is that the trial court denied him his federally guaranteed right to present witnesses in his own defense. (See *Taylor* v. *Illinois* (1988) 484 U.S. 400, 408 [108 S.Ct. 646, 652-653, 98 L.Ed.2d 798]; *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [93 S.Ct. 1038, 1049, 35 L.Ed.2d 297].) In this case, the defense would have been that some third party (i.e., Trone) was the actual killer.

We have rejected this precise argument. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) In this case, defendant was not precluded from attempting to prove Trone was the actual triggerman. Instead, he merely was precluded from proving it with time-consuming hearsay and character evidence that was not particularly probative on the question. Moreover, defendant claims that the prosecutor committed prejudicial misconduct by arguing, in Trone's separate trial, that the evidence of Trone's past violent behavior and provocative statements was admissible. He contends that if the prosecutor had suddenly realized such evidence was admissible after all, he was ethically bound to reveal this fact to the trial court during the proceedings on defendant's new trial motion. He presents this contention perfunctorily, however, without argument or authority in support, and we reject it in kind. (*People* v. *Alvarez, supra*, 14 Cal.4th at p. 210, fn. 16.)

Defendant also asserts in effect that the trial court applied a double standard to the foregoing offers of proof by permitting the prosecution to admit similar testimony in proceedings against Trone. But what happened in those proceedings has no bearing on the propriety of the ruling in this case.[3]

We find no state law error, and no violation of the due process clause.

*Admitting Rebuttal Evidence of Traces of Blood on Defendant's Pants*

██ Defendant contends in effect that the court violated the due process clauses when it ruled, over his objections on grounds of relevance, undue prejudice (Evid. Code, § 352), and offering improper rebuttal evidence, that

---

[3]Defendant attaches papers to his brief that he states are taken from the reporter's transcript of those proceedings, and asks that we take judicial notice of the transcripts from Trone's trial proceedings or augment the record to include them. For the reasons stated in the text, we deny the requests.

the jury could hear, during the prosecution's rebuttal case, newly discovered evidence that two specks of blood had been found on the pants he was wearing on the morning of his arrest. The specks were too small to reveal whom they might have come from, and one was so small that the prosecution's criminalist could not even testify that it was human blood, only that it "tested presumptively positive for blood" of some type. The prosecution offered the evidence to rebut defendant's testimony that he was more than 10 feet from Haro when Trone shot her.

As with the claim regarding character evidence, *ante*, the predicate of defendant's evidentiary claims is that the court abused its discretion (see *People* v. *Rodrigues*, *supra*, 8 Cal.4th at p. 1164) in admitting this rebuttal evidence. Accordingly, we scrutinize the claim for a violation of state law.

As far as relevance and undue prejudice are concerned, no violation of state law occurred. The evidence was relevant, even if the jury decided that it was minimally important. The jury could have used it to decide that defendant was close to Haro when she was killed, and hence it supported a conclusion that he was the triggerman, a question placed in issue by the allegation that he used a firearm. Nor was the evidence unduly prejudicial: Defendant was barely spattered, and he admitted that he was present when Haro was killed. We find no abuse of discretion in admitting the evidence. The jurors could assign the weight to it that it deserved. In cross-examination and closing argument, defendant emphasized the evidence's slight value: The blood could have come from anyone at any time.

The same is true with regard to the claim of improper introduction of rebuttal evidence. Defendant's testimony permitted the prosecution to introduce evidence suggesting that he was closer to Haro than he had declared. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 859 [277 Cal.Rptr. 122, 802 P.2d 906].)

We find no state law error, and no violation of the due process clause.

### Admitting Evidence of Lack of Remorse at the Guilt Phase

■ Defendant cried during his guilt phase testimony. In *in limine* argument, the prosecution suggested his display of emotion may have been manufactured to buttress his credibility. It sought to introduce rebuttal evidence that he showed no remorse when confessing to the crimes to the police. Defendant objected that the testimony would be improper rebuttal and that admitting it would be "reaching to the ends of the universe." The trial court ruled that the testimony was admissible, and an investigator told the jury that defendant showed no remorse when confessing.

Defendant renews his contention on appeal, and claims that the procedure violated rights to a fair trial contained in the state and federal Constitutions. As stated *ante*, page 306, we review the ruling for an abuse of discretion.

It is true that unless a defendant opens the door to the matter in his or her case-in-chief (*People* v. *Clark* (1993) 5 Cal.4th 950, 1016 [22 Cal.Rptr.2d 689, 857 P.2d 1099]), his or her remorse is irrelevant at the guilt phase. The People contend that the evidence was proper to impeach "demeanor evidence" in the form of defendant's display of emotion while testifying. (See *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] (lead opn.) [argument regarding defendant's demeanor as a witness is proper].) But a display of tears on the witness stand, assuming that it is character evidence, does not necessarily open the door to " 'any and all "bad character" evidence the prosecution can [generate]. As in other cases, the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf.' " (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1193 [270 Cal.Rptr. 286, 791 P.2d 965], italics deleted.) Defendant's demeanor (see Evid. Code, § 780, subd. (a)), if evidence at all, only showed that he currently regretted his conduct.

The court's ruling was correct. On direct examination, defendant had testified that he felt remorse during the interrogations that took place the day after committing the crimes. The People's rebuttal witness was present at those interrogations and testified that he saw no sense of remorse at that time, or when he had contact with defendant the day following the initial interrogations. This was proper rebuttal evidence (*People* v. *Clark*, *supra*, 5 Cal.4th at p. 1016), and the court did not abuse its discretion in admitting it.

*Admitting Evidence of Bank Records*

As stated, defendant testified that he did not try to gain access to Haro's bank account after her death. In rebuttal, and over his objection on grounds of hearsay and violation of the best evidence rule, the prosecution introduced the testimony of a bank executive who produced microfiche records showing that someone tried (without success, for want of the correct personal identification number) to withdraw a total of $420 from Haro's account at two automated teller machines six times between 6:03 and 6:30 a.m. the day after the crimes, shortly before defendant's arrest. The records were entered into evidence. Haro's husband testified that he did not try to gain access to the account with his own card, and that he knew of no other cards other than his and hers that were usable for the account.

Defendant renews his contention that the records were hearsay, not within any exception. He styles his claim a violation of his confrontation

rights under the Sixth Amendment to the United States Constitution, although he only discusses state law. We assume, therefore, that he predicates the former claim on the latter.

We review a ruling that a business record was admissible under an exception to the hearsay rules for an abuse of discretion. (*People* v. *Beeler* (1995) 9 Cal.4th 953, 978-979 [39 Cal.Rptr.2d 607, 891 P.2d 153].) There was none here. The executive testified *in limine* that the information was contained in computer reports that the bank transferred to microfiche. The trial court could reasonably conclude, as it did, that the evidence met the requirements of the hearsay and best evidence rules. With regard to the hearsay rule, a qualified witness would testify that the microfiche was a trustworthy record made in the regular course of business, near when someone made an attempt to access Haro's account. (Evid. Code, § 1201; see also *id.*, § 1271.) As a trustworthy business record stored on microfiche, the evidence satisfied the requirements of an exception to the best evidence rule—i.e., the rule that ordinarily "no evidence other than the original of a writing is admissible to prove [its] content . . ." (*id.*, § 1500). The exception provides that a microfiched business record is admissible despite the rule contained in Evidence Code section 1500. (*Id.*, § 1550.) There was no state law error, and defendant's Sixth Amendment claim, predicated on the assertion that there was, also fails to persuade.

### *Comparing Defendant to a Terrorist in Rebuttal Argument*

Defendant contends that the prosecutor committed misconduct in his rebuttal closing argument by comparing him to a terrorist and that the court did not cure the harm. He claims that these lapses resulted in an unfair trial in violation of unspecified provisions of the state and federal Constitutions.

In the course of argument, the prosecutor said, "you know, a woman, going to a mall should be able to go to Penney's and shop, and buy some—a baby shower gift without being kidnapped, raped and murdered. I mean, this isn't any better than a terrorist attack. They have something in common. Terrorists don't pick their victims—they pick their victims at random, and so did these two men. They just picked her at random. [¶] People should be able to go shopping at a mall and not have to endure this. So we all say 'They should do something.' 'They should do this; they should do that.' Well, guess what? You're the 'they.' You're the 'they.' And you've always been the 'they.' "

The People contend that defendant failed to ask the court to assign misconduct to the remarks. This is true. Accordingly, the claim was not preserved for review.

We reject defendant's reply that counsel was ineffective for failing to object, for the remarks were not inappropriate and an objection would have been meritless.

■ A defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) ■ Defendant is unable to show that counsel's performance was deficient.

In the main, the prosecutor was reminding the jury of its civic duty to return, as he said soon after in the same argument, "a true verdict based on the evidence in the case." This was valid argument. (See *People* v. *Osband* (1996) 13 Cal.4th 622, 723 [55 Cal.Rptr.2d 26, 919 P.2d 640].) His reference to terrorism was fair under the circumstances. "When discussing sex and kidnapping offenses involving the elements of force, fear, and lack of consent, the prosecutor was entitled to argue the existence of those elements in vigorous terms." (*People* v. *Arias* (1996) 13 Cal.4th 92, 160 [51 Cal.Rptr.2d 770, 913 P.2d 980]; see also *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1251 [278 Cal.Rptr. 640, 805 P.2d 899] [no misconduct in calling the defendant a " 'perverted maniac' " during guilt phase argument].) It was not deficient for counsel to fail to register a meritless objection.

*Ineffective Assistance of Counsel—Challenge to Juror Misconduct*

■ Defendant also claims that counsel was ineffective for failing to ensure that he was tried by an impartial jury. He refers to two incidents of juror misconduct. One juror, seeing Haro's mother in the court cafeteria, asked if she was related to her, to which she replied by nodding her head. Another juror saw Haro's husband outside and told him that a former neighbor said hello. The court held a hearing about each incident when it learned of it.

Counsel stated that the cafeteria incident was "nothing" at all. He did ask the court to reinstruct the jurors not to communicate with anyone about the case, which the court did. In the other incident, counsel initially called the misconduct a "flagrant violation." After a recess to consider his options, he decided to ask that the juror be excused, albeit "[w]ith great reluctance, because I liked her as a juror . . . ." The court summoned the juror for an explanation. After hearing her say that she understood her duty not to talk to others associated with the case, but that she blurted out the greeting "without

even thinking," counsel changed his mind, deciding that "I guess it doesn't amount to much." The court admonished the juror not to repeat the mistake. She agreed and also stated that she could continue to be fair to defendant. The court then admonished the jury not to talk to anyone associated with the case, even in the most innocuous fashion.

Of course it was misconduct for the jurors to communicate with anyone associated with the case. (See § 1122.) But the misconduct was not egregious, and on this record it cannot be said that counsel was deficient for not challenging the jurors' continued service. (See *People* v. *Lucas* (1995) 12 Cal.4th 415, 487 [48 Cal.Rptr.2d 525, 907 P.2d 373].) These were tactical choices, and on this record we see nothing unreasonable about them. Ordinarily, when the appellate record fails to reveal why counsel proceeded as claimed, "[a] claim of ineffective assistance . . . is more appropriately decided in a habeas corpus proceeding." (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) This is such a case.[4]

### Instructing on Reasonable Doubt

The trial court instructed the jury in the language of then CALJIC No. 2.90, the standard reasonable doubt instruction. Defendant maintains that by so doing, the court violated his due process rights under the federal Constitution and committed per se reversible error, by instructing the jurors that they could ponder their personal feelings, as opposed to merely the facts, in determining his guilt or innocence. "We have repeatedly upheld the efficacy of this instruction, and defendant cites no persuasive reason to revisit this conclusion." (*People* v. *Bradford* (1997) 14 Cal.4th 1005, 1054 [60 Cal.Rptr.2d 225, 929 P.2d 544].)

### Sentencing on Kidnapping for Robbery

Defendant maintains that the court incorrectly sentenced him to life imprisonment without possibility of parole on count 2, kidnapping for the purpose of robbery. The People concede the point. We agree: The crime is punishable by ordinary life imprisonment. (§ 209, subd. (b).) The abstract of judgment must be modified accordingly.

---

[4]Defendant argues by speaking to Haro's mother, the juror "clearly indicate[d] her sympathy toward the victim and her family," "creat[ing] the possibility that [other] members of the jury would share her feelings . . . ." He states that such sympathy could have affected the deliberations. But the claim is speculative, and we reject it accordingly.

*Penalty Phase Issues*

*Effect of Purported Error in Trying Oral Copulation Questions*

Defendant contends that if we reverse his conviction for forcible oral copulation and set aside the accompanying special circumstance, we must reverse his sentence to death. He contends that the trier of fact's determination has been compromised by the guilt phase errors, and that his automatic motion to modify the verdict to life imprisonment without possibility of parole (§ 190.4, subd. (e)) was similarly infected. He discerns a violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.

We have, however, determined that the prosecution established the corpus delicti of oral copulation.

*Excluding Testimony of Trone's Character for Violence*

In an effort to resurrect the question who shot Haro, defendant renewed his request to introduce the testimony of Kevin Tillett to show Trone's character for violence. (See *ante*, pp. 304-305.) He contended that it would be mitigating evidence of the crime's circumstances (§ 190.3, factor (a)) and of his relatively minor role (*id.*, factor (j)) in it. The court ruled that its prior ruling applied, and for the same reasons. Defendant now contends that this ruling violated state law and the Eighth and Fourteenth Amendments to the United States Constitution, because it would have tended to show the circumstances of the crime (§ 190.3, factor (a)) and to prove that he was under Trone's domination (*id.*, factor (g)). For the reasons stated in our discussion of this point at the guilt phase, we disagree: The court's ruling was not an abuse of discretion.

*Instructing That Prior Violent Activity Could Be Considered Felonious*

The jury heard aggravating evidence of defendant's prior violent criminal activity (§ 190.3, factor (b)). A classmate testified that he beat her severely, possibly with a chair, at Pasadena High School on January 17, 1986. She went to the hospital. Although she testified that she could not be sure she was pregnant at the time of the attack, she had not had menstrual periods for three months before then, and afterward they resumed. Thus the jury could infer she had miscarried. The parties agree that defendant presented documentary evidence that he admitted in juvenile court having committed a misdemeanor battery (§§ 242, 243, subd. (a)) following the attack.

The prosecution asked for and the court gave an instruction that the jury could consider whether defendant committed assault likely to cause great

injury (§ 245, subd. (a)(1)) or battery, and that if a juror was satisfied beyond a reasonable doubt that "such criminal activity" occurred, he or she could consider it in aggravation. The first offense is a potential felony.

Preliminarily, the People contend that defendant failed to preserve these claims for review. That is incorrect. With regard to defendant's evidentiary claim, he argued at trial that the People were estopped "from attempting to show more than the battery that they accepted as a plea." And he may bring his claim of instructional error even if he did not object at trial. (§ 1259.)

Defendant first contends that it is unconstitutional to permit the jury to consider evidence of unadjudicated offenses. He acknowledges that we have rejected this claim. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].) We decline to reconsider our view.

Defendant contends that the court should not have permitted the prosecution to introduce evidence of any conduct more serious than what he admitted in juvenile court. He also claims that giving the instruction permitting the jury to consider whether he committed assault likely to cause great injury violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. But he is incorrect on both points. "Evidence of prior violent conduct is admitted under Penal Code section 190.3, factor (b), 'to enable the jury to make an individualized assessment of the character and history of the defendant to determine the nature of the punishment to be imposed.' [Citation.] ' "[I]t is not [only] the fact of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense." ' [Citation.] Indeed, Penal Code section 190.3, factor (b), 'expressly permits proof of *any* violent "criminal activity" regardless of whether it led to prosecution or conviction.' [Citation.]" (*People* v. *Davis* (1995) 10 Cal.4th 463, 544 [41 Cal.Rptr.2d 826, 896 P.2d 119, original italics] [discussing instructional error and addressing state law and the Eighth and Fourteenth Amendments]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].) Accordingly, the trial court in the present case did not err by permitting the prosecution to introduce evidence from which the jury could find the attack constituted an assault by means likely to inflict great bodily injury. Nor did it err by instructing the jury on this point.

Defendant further contends that the procedure violated the double jeopardy clauses of the state and federal Constitutions. Again he is incorrect. These guaranties are inapplicable when "evidence of prior criminal activity is introduced in a subsequent trial as an aggravating factor for consideration by a penalty phase jury." (*People* v. *Garceau* (1993) 6 Cal.4th 140, 199-200

[24 Cal.Rptr.2d 664, 862 P.2d 664] [referring to a constitutional guaranty in the singular].) And because he has not been "subject for the same offense to be twice put in jeopardy of life or limb" (U.S. Const., Amend. V), his claim that the Fifth Amendment gives him "a right to be tried only on the grand jury's indictment" is without merit—he was not tried here *for* the prior offense at all, although evidence of its circumstances was introduced against him in his penalty trial for his current crime.

We also reject a contention that defendant bases on *Kellett* v. *Superior Court* (1966) 63 Cal.2d 822 [48 Cal.Rptr. 366, 409 P.2d 206]. He argues that the trial court erred in permitting the jury to consider whether his attack on his classmate was the potential felony of assault by means likely to inflict great bodily harm because that crime could have been charged in the charging document to which defendant ultimately pleaded. *Kellett*, however, applies to second prosecutions. Defendant is not being retried for crimes arising from the same set of operative facts. *Kellett* is thus inapplicable. In any event, it does not appear that he objected on this ground; the issue was thus not properly preserved for appeal.

Defendant further contends that the court erred by refusing to give an instruction he requested. The denied instruction would have stated that battery was a less serious crime than the assault-based offense, and would have told the jurors that if they found beyond a reasonable doubt that the attack occurred, but did not find it to constitute the more serious offense beyond a reasonable doubt, they must find it was the "lesser offense of battery . . . ." He claims that he was denied "his constitutional right to a fair penalty trial" when the court refused to give the instruction.

Granting the request might have harmed defendant by signaling that the assault-based offense, for which there was strong evidence, was a more serious crime than simple battery, a misdemeanor. Under the instructions given, the jury was only told that the incident, if found true, constituted "criminal activity"; either offense, whether "assault upon the person of another by means of force likely to produce great bodily injury" or "misdemeanor battery" was a "crime." There was no announcement of the possible offenses' relative gravity, and defendant could only have benefitted from the ruling. We need not decide whether error occurred, for any that did was harmless.

*Other Claims of Instructional Error*

Defendant contends that the court erred in refusing to give three special instructions: that "[t]he absence of any prior felony convictions is a

significant mitigating circumstance in a capital case such as this," that "[o]ne mitigating circumstance may be sufficient to support a decision that death" is not the proper penalty, and that the jurors could return a verdict of life imprisonment "for any reason related to the evidence you deem appropriate and satisfactory" even if they found no mitigating circumstances whatsoever.

We disagree in all three cases. The jury was instructed that it could consider "[t]he presence or absence of any prior felony conviction . . . ." The first proposed instruction was inaccurate—the significance of the evidence was for each juror to decide. The second proposed instruction would have been duplicative: the court instructed the jury to return a verdict of life imprisonment without possibility of parole if it found that the aggravating factors did not *substantially* outweigh the mitigating factors, if it outweighed them at all. Leaving aside any question of the third proposed instruction's legal accuracy, it would also have been duplicative: The jury was instructed, in an expanded version of the language of section 190.3, factor (k), that it could consider mitigating "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's background, character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

We have previously decided the following questions and adhere to our prior view: The trial court did not err by refusing to give defendant's requested special instruction on lingering doubt whether he personally shot Haro. (E.g., *People* v. *Osband, supra,* 13 Cal.4th at p. 716.) And, in light of the above quoted instruction the court gave that expanded section 190.3, factor (k), the court did not err by refusing to give defendant's requested special instruction on mercy. (*People* v. *Stanley* (1995) 10 Cal.4th 764, 840 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Nor did it err by refusing to instruct on sympathy. (*People* v. *Clark* (1992) 3 Cal.4th 41, 163 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Nor did error occur when the court failed to instruct that the question whether aggravation outweighed mitigation must be proved beyond a reasonable doubt (*People* v. *Osband, supra,* 13 Cal.4th at pp. 709-710), to define the meaning of life imprisonment without possibility of parole (*id.* at pp. 715-716), or to specify which factors might be aggravating and which might be mitigating (*id.* at p. 705). We have also rejected the contention that the California death penalty statute is unconstitutional "because the special circumstances which determine death eligibility are so numerous and broad that they fail to 'genuinely narrow' the class of persons eligible" (*People* v. *Ray, supra,* 13 Cal.4th at p. 356).

*Comparing Defendant to a Terrorist During the Guilt Phase*

■ During closing argument at the guilt phase, the prosecutor compared defendant to a terrorist. (*Ante*, p. 308.) He contends that this characterization of him was misconduct that infected the penalty phase—specifically that it denied him a fair penalty trial, presumably in violation of various state or federal constitutional guaranties, or both (see *People* v. *Memro, supra*, 11 Cal.4th at p. 877 [construing 1977 death penalty statute]).

As we stated in the guilt phase discussion, defendant failed to object to the remarks about which he now complains. Accordingly the point is not preserved for review. Moreover, we have noted that these remarks did not constitute misconduct even at the guilt phase, in which defendant's character was not at issue. If the prosecutor had compared him to a terrorist in argument at the penalty phase, no misconduct would have occurred. Such a "declaration certainly [would have fallen] within the wide range of permissible argument at the penalty phase." (*People* v. *Osband, supra*, 13 Cal.4th at p. 703.) Hence we cannot agree that the remarks to which he objects resulted in denying him a fair penalty trial.

*Ineffective Assistance of Counsel—Challenge to Juror Misconduct*

At pages 309-310, *ante*, we rejected defendant's guilt phase contention that counsel was ineffective for failing to challenge more completely two jurors who committed misconduct. He renews his claim of ineffective assistance, contending that he was prejudiced at the penalty phase by their continued presence. We rejected this claim in our prior discussion and do so again.

*Cumulative Error*

Defendant maintains that cumulative error at or related to the guilt phase requires that his death sentence be reversed. He asserts that the errors he discerns resulted in violations of numerous rights contained in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He further argues that the collective effect of these errors must be reviewed under the standard of prejudice set forth in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. We have, however, not found any error in the guilt phase proceedings, except for the ministerial error in imposing an incorrect sentence on count 2 (*ante*, p. 310). Under any standard of review, we cannot conclude that this single error requires reversing the death sentence.

*Denying Motions for New Trial on Basis of Jury Misconduct or to Reveal Jurors' Names and Addresses to Ascertain Whether Misconduct Occurred*

█ After the jury returned a verdict of death and was dismissed, the Star-News, a Pasadena newspaper, quoted a juror as saying, " 'He didn't deserve any more than she [Haro] did. He doesn't deserve to go to prison, take classes and have conjugal visits . . . . We need a deterrent. We need to make a statement.' " (Ellipsis in original.)

On the strength of these comments, defendant moved for a new trial on the basis of jury misconduct or, in the alternative, to compel disclosure of the jurors' telephone numbers and addresses to ascertain whether misconduct occurred. The purported or hypothesized misconduct consisted of failing to follow an instruction that the jurors were not to consider the deterrent effect of their penalty decision.

The trial court denied the motions. Defendant claims that the decisions violated state law and rights contained in the United States and California Constitutions to a reliable penalty determination.

A losing defendant may be entitled to a new trial "[w]hen the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented[.]" (§ 1181, subd. 3.)

The trial court stated that it would assume the comments were accurately reported. It rejected the motion because "[i]n this case, the statements attributed to the jury foreperson—assuming that she made them as defense counsel asserts, which I do for the purpose of this motion—nonetheless, do[] not implicate juror misconduct . . . . The inquiry would clearly and improperly go to the mental processes by which the verdict was reached and the contents of juror deliberations."

The court misapprehended the scope of subdivision (a) of Evidence Code section 1150, which bars admitting evidence showing the effect of statements or events on the mental processes of a juror, but does permit admitting "any otherwise admissible evidence" to show that statements were made or events occurred. Thus, even if the juror's posttrial statements were not themselves misconduct, arguably they provided a basis for permitting defendant to investigate whether the jury discussed the improper subject of deterrence during deliberations. (See *People* v. *Perez* (1992) 4 Cal.App.4th 893, 908 [6 Cal.Rptr.2d 141] [jury misconduct to disregard trial court's express instruction not to consider defendant's failure to testify].)

Defendant must, however, show an abuse of discretion in declining to hold a hearing on jury misconduct (*People* v. *Osband*, *supra*, 13 Cal.4th at pp. 675-676) or to order a new trial (*People* v. *Clair* (1992) 2 Cal.4th 629, 667 [7 Cal.Rptr.2d 564, 828 P.2d 705]). No evidence shows that the trial court abused its discretion in either respect. Telling a newspaper that " '[w]e need a deterrent' " does not suggest that the juror, or any juror, considered deterrence in deliberating. The court could reasonably have thought that the juror was saying only that society needs the option of extreme punishment for crimes as cruel as defendant's, and that she might have privately considered the same when deliberating, in which case subdivision (a) of Evidence Code section 1150 would have barred further inquiry. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022].)

We also address the question whether, in denying the motion to compel disclosure of jurors' addresses and telephone numbers, the court abused its discretion—the standard of review we believe should apply to such motions (see Code Civ. Proc., § 237, subd. (a)(1)). It did not. Because the verdict was returned before Code of Civil Procedure 237 was enacted, we agree with the People that the substantive rule set forth in *People* v. *Rhodes* (1989) 212 Cal.App.3d 541 [261 Cal.Rptr. 1] applies. *Rhodes* held that "counsel for a convicted defendant is entitled to the list of jurors who served in the case, including addresses and telephone numbers, if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*Id.* at pp. 551-552.) The trial court relied on *Rhodes* and ruled that none of its conditions had been met. It did not abuse its discretion in so ruling. Even if the juror's offhand purported comment, reportedly made after she was discharged from the jury, provided a "sufficient showing to support a reasonable belief that jury misconduct occurred" (*id.* at p. 552), defendant did not show the court that he had made "diligent efforts . . . to contact the jurors through other means" (*ibid.*). He simply informed the court that because no juror had supplied the requested information during voir dire or on the jury question-naire he had "no way to contact the individual jurors . . . without the court's assistance."

*Denying Motion for Continuance to Present Modification Motion*

■ Defendant contends that the court erred under state law and violated his state and federal constitutional rights to due process and the effective assistance of counsel when it denied his motion for a continuance from June 4, 1991, to July 8 of that year, or at least for "a few days," to present his

motion to modify the verdict (§ 190.4, subd. (e)). He filed the motion the day before the hearing. Counsel explained that he was physically and emotionally exhausted from the "horribly debilitating experience" of the trial, and was simultaneously preparing the motions for new trial and to disclose juror information (discussed *ante*). The court denied the request, explaining that that the trial had ended 27 days before defendant filed the motion to continue, that he filed it the day before his sentencing, that Haro's family was present for his sentencing, and that it had already "carefully reviewed all the exhibits and the testimony . . . from the guilt and penalty phases" in connection with the motion to modify. It ruled that good cause to grant the motion was absent.

We review a ruling on a motion to continue (§ 1050) for an abuse of discretion. (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 945 [42 Cal.Rptr.2d 636, 897 P.2d 574].) None appears. The court's decision does not fall outside the bounds of reason. Indeed, subdivision (b) of section 1050 ordinarily (see *id.*, subd. (c)) permits granting a continuance only if, among other things, "written notice [is] filed and served . . . at least two court days before the hearing sought to be continued. . . ." Here, defendant filed his motion the day before the motion to modify was to be heard. There was no state law error, nor any basis for defendant's constitutional claims.

Defendant also contends that counsel's failure to file the motion to continue earlier denied him the effective assistance of counsel. We need not decide whether counsel's action was deficient, for we discern no prejudice— i.e., there is no reasonable probability that the outcome would have differed if he had filed the motion to continue earlier and the court had granted it. The legal standards governing the motion to modify are well known, having been set forth in the language of subdivision (e) of section 190.4 and explicated in case law. The court was, as it said, well prepared to rule on the motion. It explained at length why it was denying it, discussing the law and the facts. With regard to the latter, and to the major issue contested in the guilt phase, it said that the evidence supporting the allegation of personal use of a firearm—i.e., that defendant killed Haro—was "overwhelming." It found the People's witnesses credible but defendant, "in many particulars" of his testimony, not. It specifically found that his testimony he did not shoot Haro was not credible. It described the circumstances of the crime—"[t]he murder of Lois Haro was a cold, clear, thought-out and cowardly execution by gunfire of a defenseless woman, done without mercy"—as "a very strong factor in aggravation" and contrasted the grave facts underlying that factor with those in mitigation: age, lack of a prior felony conviction, and lack of a serious history of prior criminal activity. It ruled that the aggravating circumstances "beyond all doubt more than substantially outweigh those in

mitigation" and "independently [found] that the evidence in aggravation is so substantial as compared to the evidence in mitigation that it warrants death . . . ." In sum, the court had carefully considered the principal matters that bore on the decision to grant or deny the motion to modify the verdict when it announced its ruling. We see no reasonable probability that, had defendant been granted his motion to continue by filing it earlier, the court's stern and carefully considered assessment of the law and the facts would have varied in any fashion that might have altered the outcome.

We also reject defendant's claim that the court erred by considering the verdicts on the oral copulation charge and special circumstance allegation. As we have explained, those matters were properly before the court in this trial.

## CONCLUSION

We direct the trial court to modify the sentence on count 2 (see *ante,* p. 310), amend the abstract of judgment accordingly, and forward a copy of the amended abstract of judgment to the Department of Corrections. In all other respects, we affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—Naturally I concur in the majority opinion I have prepared for the court. I write separately to discuss the corpus delicti questions this case has raised.

## I

The corpus delicti rule requires the prosecution to produce evidence beyond a defendant's extrajudicial confession or admission (see *People* v. *Carpenter* (1997) 15 Cal.4th 312, 394 [63 Cal.Rptr.2d 1, 935 P.2d 708]) that a crime occurred before it may introduce the defendant's statement in evidence. In an illuminating law review comment, J. Terry Schwartz explained that the law of corpus delicti contains "two distinct, though related, concepts. . . . First, the *corpus delicti* is a necessary element of the prosecution's case in a criminal trial . . . Thus, a precondition to conviction is that the state prove that a 'crime' has been committed—otherwise there could not possibly be guilt, either in the accused or in anyone else." (Comment, *California's Corpus Delicti Rule: The Case for Review and Clarification* (1973) 20 UCLA L.Rev. 1055, fn. 1 (hereafter Schwartz).) The corpus delicti is a showing that *someone* committed a crime (*People* v. *Cobb*

(1955) 45 Cal.2d 158, 161 [287 P.2d 752]; *The King* v. *Horry* (1951) N.Z.L.R. [1952] 111, 121), and "one does not begin to inquire whether the prisoner is guilty of a crime until one has established that a crime has been committed." (*Regina* v. *Onufrejczyk* (1955) 1 Q.B. 388, 394 (per Lord Goddard, C. J.).)[1]

"The second concept is closely related to the first. The 'corpus delicti rule' prohibits the prosecutor from establishing the *corpus delicti* . . . through the use of the extrajudicial statements of the defendant. [Citations.] Thus the state must prove the *corpus delicti* independently of the accused's out-of-court declarations. The rule further provides that once the *corpus delicti* has been proved by such evidence *aliunde*, the extrajudicial statements then become admissible to determine the defendant's connection with the crime." (Schwartz, *supra*, 20 UCLA L.Rev. at p. 1055, fn. 1.) Hence, "before a confession may be introduced" independent evidence must show "that a crime has been committed by someone." (*People* v. *Cobb, supra*, 45 Cal.2d at p. 161.) In this second sense, "[t]he corpus delicti rule is a rule of law that governs the admissibility of evidence." (*People* v. *Diaz* (1992) 3 Cal.4th 495, 529 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (lead opn.); accord, *id.* at p. 577 (conc. and dis. opn. of Mosk, J.).)

The purpose of the corpus delicti rule is to assure that "the accused is not admitting to a crime that never occurred." (*People* v. *Jennings* (1991) 53 Cal.3d 334, 368 [279 Cal.Rptr. 780, 807 P.2d 1009].) The rule arose because of the law's unease with inflicting punishment when a "confession may have been misreported or misconstrued, elicited by force or coercion, based upon mistaken perception of the facts or law, or falsely given by a mentally disturbed individual. [Citations.] Thus, it is clear that the corpus delicti rule was established to prevent not only the possibility that a false confession was secured by means of police coercion or abuse but also the possibility that a confession, though voluntarily given, is false." (*City of Bremerton* v. *Corbett* (1986) 106 Wn.2d 569, 576-577 [723 P.2d 1135, 1139].)

In this case, however, the prosecution met its burden. "[M]any other circumstances of deep inculpatory import" (*The King* v. *Horry, supra*, N.Z.L.R. [1952] at p. 124) beyond defendant's extrajudicial statements were available to support the trial court's conclusion that the prosecution had established the corpus delicti of oral copulation.

---

[1]It is often useful to parse this definition for purposes of analysis: " ' "The corpus delicti of a crime consists of two elements[:] the fact of the injury or loss or harm, and the existence of a criminal agency as its cause." ' " (*People* v. *Zapien* (1993) 4 Cal.4th 929, 985-986 [17 Cal.Rptr.2d 122, 846 P.2d 704].) In other words, in the case of unlawful homicide "[c]orpus delicti means, first, that a crime has been committed, that is to say, that the man is dead, and that his death has been caused by a crime." (*Regina* v. *Onufrejczyk, supra*, 1 Q.B. at p. 393.)

## II

With 32 principal categories of special circumstances (Pen. Code, § 190.2) and a decision of this court interpreting one of them "so broad[ly] in scope as to embrace virtually all intentional killings" (*People* v. *Morales* (1989) 48 Cal.3d 527, 575 [257 Cal.Rptr. 64, 770 P.2d 244]) (conc. and dis. opn. of Mosk, J.)), the 1978 death penalty law gives a prosecutor wide discretion to seek the death penalty for a defendant charged with first degree murder. That latitude increases the risk that an innocent person will be executed. Yet because the death penalty, once exacted, is irrevocable, the need for the most reliable possible determination of guilt and penalty is paramount as a matter of policy. It is also constitutionally compelled: "[T]he Eighth Amendment imposes heightened reliability standards for both guilt and penalty determinations in capital cases . . . ." (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 623 [25 Cal.Rptr.2d 390, 863 P.2d 635].) By contrast, a mistake in a sentence of imprisonment is not beyond repair. Yet the increasing length of prison terms for violent crime also requires a highly reliable fact finding procedure in determining guilt.

Therefore, I wish to emphasize the corpus delicti rule's importance in ensuring reliable determinations of guilt and, in capital cases, penalty. Though the rule is venerable, it is not a recondite academic curiosity or a quaint vestige of times when confessions commonly may have been extracted by torture or beating. Its importance endures.[2]

Apparently every state, by statute, rule, or court decision, adheres to some variant of the corpus delicti rule. (See 1 McCormick on Evidence (4th ed. 1992) Confessions, § 145, p. 555; *State* v. *Parker* (1985) 315 N.C. 222, 229 [337 S.E.2d 487, 491]; *Com.* v. *Forde* (1984) 392 Mass. 453 [466 N.E.2d 510, 513].) The rule arose because of the law's unease with inflicting punishment solely on the basis of a confession that might be false and the product of insanity or coercion (*Jones* v. *Superior Court* (1979) 96 Cal.App.3d 390, 397 [157 Cal.Rptr. 809]), or of the mistaken belief that a false confession would be beneficial (Note, *Proof of the Corpus Delicti*

---

[2]Except as noted, the ensuing discussion addresses the law of corpus delicti only in its second, or evidence-related aspect—i.e., that independent evidence must corroborate a defendant's inculpatory extrajudicial statement. It is not in question that the state must establish the corpus delicti of a crime—i.e., provide evidence "that the offence charged has been committed by someone" (*The King* v. *Horry, supra,* N.Z.L.R. [1952] at p. 121; accord, *People* v. *Cobb, supra,* 45 Cal.2d at p. 161 [287 P.2d 752])—before a defendant may be convicted of it. Indeed, in Penal Code section 871 the Legislature has instructed that at the end of the preliminary examination the magistrate must order the complaint dismissed if "it appears . . . that no public offense has been committed . . . ." This requirement could hardly exist in concert with other statutory provisions entirely abolishing the concept of corpus delicti.

*Aliunde the Defendant's Confession* (1955) 103 U.Pa. L.Rev. 638, 643). "[W]hen the admission is full and positive, it perhaps quite as often happens that it has been made under the influence of the terrible fear excited by the charge, and in the hope that confession may ward off some of the consequences likely to follow if guilt were persistently denied." (Cooley, Constitutional Limitations (8th ed. 1927) Protections to Personal Liberty, p. 654 (hereafter Cooley).) In similar words, the law's unease with uncorroborated confessions "stems from the possibility that the confession may have been misreported or misconstrued, elicited by force or coercion, based upon mistaken perception of the facts or law, or falsely given by a mentally disturbed individual. [Citations.] Thus, it is clear that the corpus delicti rule was established to prevent not only the possibility that a false confession was secured by means of police coercion or abuse but also the possibility that a confession, though voluntarily given, is false." (*City of Bremerton* v. *Corbett*, *supra*, 106 Wn.2d 569, 576-577 [723 P.2d 1135, 1139].)

The risk of erroneously executing an innocent individual because of a false confession appears to form one basis for the law's unease with convicting him or her solely on the basis of a confession. (Schwartz, *supra*, 20 UCLA. L.Rev. at pp. 1063-1064.) In certain early English homicide cases "in which no body was found and conviction was based solely on a confession, the courts experienced the shock of having the person who had been thought dead turn up alive after his supposed murderer had been executed." (Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession, supra,* 103 U.Pa. L.Rev. at p. 638.) It has been claimed that as many as "[f]our English cases dramatically influenced the concept of *corpus delicti*. In each . . . the defendants were convicted of murder, [and] some of them were [hanged], yet the alleged victim subsequently reappeared." (Comment, *Other Crimes Evidence to Prove the Corpus Delicti of a Child Sexual Offense* (1985) 40 U. Miami L.Rev. 217, 237, fn. 130; but see *post,* fn. 3.) In *Perrys' Case* (1660) 14 Howell's State Trials 1311, three members of the Perry family were hanged, on the strength of the confession of one of the Perry sons, for murdering William Harrison. After the Perrys' execution Harrison reappeared, announcing that he had been kidnapped and carried off to Turkey, and that he eventually escaped and returned to England via Portugal.[3]

---

[3]Recent English cases have stated that "there is apparently no reported case in English law where a man has been convicted of murder when there has been no trace of the body at all." (*Regina* v. *Onufrejczyk* (1955) 1 Q.B. 388, 394 (per Lord Goddard, C. J.)); see also *McGreevy* v. *Director of Public Prosecutions* (H.L. 1973) 1 All E.R. 503, 510 (per Lord Morris of Borth-y-Gest).) But *Perrys' Case, supra,* 14 Howell's State Trials 1311, would seem to belie *Onufrejczyk*'s statement, even if, as one commentator has asserted, it is "the only case in which a clearly innocent individual was executed solely on the basis of an erroneous confession." (Schwartz, *supra,* 20 UCLA L.Rev. at p. 1063, fn. 39.) In any event, extreme

The view emerges from time to time that the rule is of "declining utility." (*Willoughby* v. *State* (Ind. 1990) 552 N.E.2d 462, 466 [collecting authorities].) This view is not new: "That the rule has in fact any substantial necessity in justice, we are much disposed to doubt," District Judge Learned Hand mentioned in a World War I-era sabotage case. (*Daeche* v. *United States* (2d Cir. 1918) 250 F. 566, 571.) In my view, the corpus delicti rule is not of "declining utility"; rather, if nothing else, it is an important impediment to the growth of the pernicious industry of jailhouse informants.

We must bear in mind that a purported extrajudicial confession or admission may arise from any source, including the testimony of a jailhouse informant. A primary purpose of the corpus delicti rule is to blunt the damaging exercise of " 'the self-interest of the accomplice' " (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 489 [83 S.Ct. 407, 418, 9 L.Ed.2d 441]). Our Legislature has recognized the potential unreliability of jailhouse informants' statements, requiring that a jury be instructed about them in cautionary terms on request. (Pen. Code, § 1127a; see also *id.*, § 4001.1.) It enacted the law because "[n]umerous county jail informants have testified to confessions or admissions allegedly made to them by defendants while in custody . . . . Snitches are not persons with any prior personal knowledge of the crime . . . They testify only that a defendant made an·inculpatory statement to them while in proximity in the jail or place of custody. [¶] [Such persons] gather restricted and confidential information by duplicitous means and thereby lend the credibility of corroboration to wholly fabricated testimony." (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 278 (1989-1990 Reg. Sess.) as amended May 4, 1989.)

Noteworthy among the arguments favoring the view that the corpus delicti rule is of "declining utility" are that under modern police procedures confessions are seldom obtained by torture or "third degree" methods of interrogation, and that the law now requires that the police alert a suspect to his or her rights to silence and to counsel. (See *Willoughby* v. *State, supra*, 552 N.E.2d at p. 466; Schwartz, *supra*, 20 UCLA L.Rev. at pp. 1089-1090.) None of the arguments against the continued viability of the corpus delicti rule, however, satisfactorily address the problem of fabricated jailhouse-informant testimony. The risk of relying solely on such informants' evidence to obtain a conviction, without any corroborating evidence, is too great to be countenanced.

---

precision in deciphering historical events is not needed to understand the principle behind the corpus delicti rule: A prisoner might admit or confess, for reasons of mistake, delusion, or coercion, to a crime no one committed, and to guard against punishing the innocent, evidence beyond an inculpatory extrajudicial statement is needed to establish that someone did commit a crime.

By requiring corroborative evidence before a jailhouse informant's testimony can be heard, the corpus delicti rule helps insulate the trier of fact from such testimony when it would be perjured or otherwise unreliable. This prophylactic function is important given the fact that "juries are likely to accept confessions uncritically" (*Jones* v. *Superior Court, supra*, 96 Cal.App.3d at p. 397); frequently "the confession operates as a kind of evidentiary bombshell which shatters the defense" (*People* v. *Schader* (1965) 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665], overruled on another ground in *People* v. *Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037]). Yet conviction by proof consisting of confession alone is less desirable than one secured by other evidence. "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." (*Escobedo* v. *Illinois* (1964) 378 U.S. 478, 488-489 [84 S.Ct. 1758, 1764, 12 L.Ed.2d 977], fns. omitted.) "If confessions could prove a crime beyond doubt, no act which was ever punished criminally would be better established than witchcraft; and the judicial executions which have been justified by such confessions ought to constitute a solemn warning against the too ready reliance upon confessions as proof of guilt in any case." (Cooley, *supra*, at pp. 653-654, fn. omitted.)

The United States Constitution, apparently recognizing "the lesson of history" (*Escobedo* v. *Illinois, supra*, 378 U.S. at p. 488 [84 S.Ct. at p. 1764]), itself applies the corpus delicti rule to prosecutions for treason: "No person shall be convicted of treason unless on the testimony of two Witnesses to the same overt act, or on confession in open Court." (U.S. Const., art. III, § 3, cl. 1.) The drafters included this provision, unusual in the Constitution in that it refers to a substantive crime, because "[t]he [Constitutional] Convention numbered among its members men familiar with government in the Old World, and they looked back upon a long history of use and abuse of the treason charge" (*Cramer* v. *United States* (1945) 325 U.S. 1, 15 [65 S.Ct. 918, 925, 89 L.Ed. 1441]).

England's treason statute dates to 1351 and the reign of Edward III. (*Cramer* v. *United States, supra*, 325 U.S. at p. 16 [65 S.Ct. at p. 926]; see *Rex* v. *Casement* (1916) 1 K.B. [1917] 98, 98-99, fn. 1, 134.) Among its abuses were trials during the reign of Henry VIII (*Cramer* v. *United States, supra*, 325 U.S. at pp. 17-18, fn. 23 [65 S.Ct. at pp. 926-927]), notably that of Sir Thomas More, in which More was convicted of high treason because of perjured testimony that More said he could not recognize Henry VIII's supremacy over the Church of England. On the strength of that testimony

More was beheaded. (*Trial of Sir T. More for High Treason* (1535) 1 Howell's State Trials 385, 387-391, 394, 396; see also *Trial of Fisher, Bishop of Rochester, for High Treason* (1535) 1 Howell's State Trials 395.)

Whether members of the Constitutional Convention had More's case in mind I do not know. But in formulating the two-witness requirement for a treason conviction unless the defendant confessed in open court, they must have been aware of abuses of the kind. (See generally, *Cramer* v. *United States, supra,* 325 U.S. 1.) Thus the drafters gave "a venerable safeguard against false testimony . . . a novel application by requiring two witnesses to the same overt act." (*Id.* at p. 24 [65 S.Ct. at p. 930].) The potential for abuse should, especially in light of the problems with fabricated jailhouse-informant testimony in California, give pause to those who argue that the corpus delicti rule is less important than it once was.

In sum, the corpus delicti rule increases the reliability of a determination of guilt, and as such remains vital to the just imposition of punishment. There remains the question, which our majority opinion herein does not decide, whether article I, section 28, subdivision (d), of the California Constitution, or Evidence Code section 351, or both, abolished the corpus delicti rule insofar as it operates to exclude relevant evidence.

## III

Article I, section 28, subdivision (d), of the California Constitution provides that "[e]xcept as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103." Evidence Code section 351 declares that "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." Relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.,* § 210.) The Law Revision Commission comment to section 351 explains that "[s]ection 351 abolishes all limitations on the admissibility of relevant evidence except those that are based on a statute, including a constitutional provision." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 351, p. 180.)

"To determine what a statute means, 'we first consult the words themselves, giving them their usual and ordinary meaning.'" (*Smith* v. *Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1155 [51 Cal.Rptr.2d 700, 913 P.2d 909] (plur. opn.).) "When the statutory language is clear and

unambiguous, there is no need for construction and courts should not indulge in it." (*People* v. *Fuhrman* (1997) 16 Cal.4th 930, 937 [67 Cal.Rptr.2d 1, 941 P.2d 1189].) Under these limitations on our license to construe statutes, it is not surprising that some appellate justices have expressed the view that the lawmakers abolished the corpus delicti rule insofar as it prohibits introducing a defendant's extrajudicial confession or admission unless the corpus delicti of the crime is established. (*People* v. *Culton* (1992) 11 Cal.App.4th 363, 373-377 [14 Cal.Rptr.2d 189] (conc. opn. of Timlin, J.) [discussing Cal. Const., art. I, § 28, subd. (d)]; *People* v. *Starr* (1970) 11 Cal.App.3d 574, 583-584 [89 Cal.Rptr. 906] (dis. opn. of Gustafson, J.) [mentioning Evid. Code, § 351, but acknowledging the force of arguments that the corpus delicti rule survived the Evidence Code's adoption].) It would seem that an extrajudicial admission or confession ordinarily would be "relevant evidence." (See *Culton, supra*, 11 Cal.App.4th at p. 374 (conc. opn. of Timlin, J.).)

Nevertheless, there is good reason to believe that neither the constitutional nor the statutory enactment abolished the corpus delicti rule in California.

First, the presence of three other statutes compels the conclusion that the Legislature did not view Evidence Code section 351 or the state Constitution as abolishing the corpus delicti rule.

Penal Code section 190.41 provides that "[n]otwithstanding Section 190.4 or any other provision of law, the corpus delicti of a felony-based special circumstance enumerated in paragraph (17) of subdivision (a) of Section 190.2 need not be proved independently of a defendant's extrajudicial statement." If the lawmakers believed that they had abolished the corpus delicti rule, they would not have created this exception to it.

Evidence Code section 1228 provides that if the court finds the hearsay statement of a child under age 12 sufficiently trustworthy in certain respects, it may admit the statement "for the purpose of establishing the elements of the crime in order to admit as evidence the confession of a person accused of violating" certain criminal laws. In other words, the statement may be used to satisfy the requirements of the corpus delicti rule. "Section 1228 basically allows evidence that would otherwise be inadmissible to be admitted in child sex crimes cases, but solely for the purpose of establishing the corpus delicti and thus paving the way for [the] trier of fact to hear the defendant's inculpatory statements." (*Creutz* v. *Superior Court* (1996) 49 Cal.App.4th 822, 826 [56 Cal.Rptr.2d 870].) If the corpus delicti rule no longer existed, Evidence Code section 1228 would not be necessary.

Subdivision (c) of Penal Code section 868.5 provides: "The testimony of the person or persons chosen [to comfort a witness testifying for the prosecution by being present in court] who are also prosecuting witnesses shall

be presented before the testimony of the prosecuting witness. The prosecuting witness shall be excluded from the courtroom during that testimony. Whenever the evidence given by that person or those persons would be subject to exclusion because it has been given before the corpus delicti has been established, the evidence shall be admitted subject to the court's or the defendant's motion to strike that evidence from the record if the corpus delicti is not later established by the testimony of the prosecuting witness." The statute's last sentence restates the corpus delicti rule: If a comforting witness related the defendant's extrajudicial inculpatory statement but the comforted witness could not later corroborate it with direct testimonial evidence, the jury must be told to disregard the inculpatory statement.

The lawmakers enacted the foregoing three provisions after both article I, section 28, subdivision (d), of the California Constitution and Evidence Code section 351 came into being. There would have been no need to do so if the corpus delicti rule did not still exist.

Second, the lawmakers may not regard the corpus delicti rule as a rule of evidence at all. "It is simply not clear that the corpus delicti rule is always identified and classified as a procedural rule of evidence rather than a rule of the substantive criminal law." (Schwartz, *supra*, 20 UCLA L.Rev. at pp. 1078-1079.) Characterizing the corpus delicti rule as substantive criminal law would account for its presence in Penal Code sections 190.41 and 868.5. The lawmakers may have been influenced by references to the law of corpus delicti as substantive criminal law that occur in legal literature. "[T]he *corpus delicti* embraces the fact that a crime has been committed by someone . . . without embracing the further fact (needed for conviction) that the defendant was the one who did or omitted that act or was otherwise responsible therefor." (LaFave & Scott, 1 Substantive Criminal Law (1986) § 1.4(b), p. 24.) A law professor has referred to "the sensible substantive criminal law doctrine of corpus delicti." (Amar, *The Future of Constitutional Criminal Procedure* (1996) 33 Am. Crim. L.Rev. 1123, 1139; see also Amar & Lettow, *Fifth Amendment First Principles: The Self-Incrimination Clause* (1995) 93 Mich. L.Rev. 857, 922; cf. Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession* (1993) 27 U.S.F. L.Rev. 385, 386 ["corpus delicti rule" is one both of substantive criminal law and of evidence].)

As Schwartz suggests, the law of corpus delicti in fact may be substantive law even in its second, or evidence-related aspect. The corpus delicti rule is sometimes seen as a substantive corroboration rule that increases the reliability of a confession. "[L]ike the parol evidence rule, [it] is a rule of substantive law and not a rule of evidence." (*Ballard* v. *State* (1994) 333 Md.

567, 571, fn. 1 [636 A.2d 474, 476].) Like the rule requiring conviction by evidence of each element of a crime beyond a reasonable doubt, it may be a substantive rule that, though requiring the introduction of a quantum and kind of evidence before it is satisfied, is not a rule of evidence itself, and hence remains unaffected by article I, section 28, subdivision (d), of the California Constitution or Evidence Code section 351. (See *People* v. *Cahill*, *supra*, 5 Cal.4th at p. 500.)

Hence, it would not be surprising if the lawmakers perceived the law of corpus delicti to be substantive criminal law in both of its aspects (see *ante*, p. 321, fn. 2), and therefore did not intend it to be affected by evidence admissibility laws.

The Court of Appeal in *People* v. *Starr*, *supra*, 11 Cal.App.3d at page 583, declared of the corpus delicti rule: "We do not believe that such a firmly established and fundamental rule of the criminal law of years' standing was overruled by any vague and indecisive provision in the Evidence Code—nor do we believe that the Legislature so intended." The same is true of the California Constitution.

Appellant's petition for a rehearing was denied March 18, 1998.