Filed 10/27/20; Opinion following rehearing
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br>BENJAMIN RAMIREZ RUIZ,<br>    Defendant and Appellant. | A153135<br>(San Mateo County Super.<br> Ct. No. 16SF011617) |

Defendant Benjamin Ramirez Ruiz was convicted after a jury trial on three counts of sex crimes he committed against his minor daughter (Minor) and sentenced to 44 years to life.  On appeal, he challenges the trial court's admission into evidence of Minor's incriminating out-of-court statements to a social worker as violating his confrontation clause rights.  He also challenges the trial court's rulings that the prosecution presented sufficient evidence to satisfy the corpus delicti rule, which rule requires, when a defendant makes extrajudicial incriminating statements, that there also be independent evidence of the corpus delicti, meaning of the body of the crime itself, in order to convict.  We affirm in part and reverse in part.  We affirm the convictions on count 3 (continuous sexual abuse of a child under 14, § 288.5) and count 5 (forcible rape of a child under 14, § 261, subd.(a)(1)).  We reverse the conviction on count 2 (oral copulation or sexual penetration of a child 10 or

1

younger, § 288.7) only because we agree with defendant that the corpus delicti rule was not satisfied regarding that count.[1]

## BACKGROUND

In December 2016, the San Mateo County District Attorney filed an information charging Ramirez Ruiz with sex crimes he allegedly committed against Minor. These were: sexual intercourse or sodomy with a child 10 years old or younger (Pen. Code, § 288.7, subd.(a),[2] count 1); oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd.(b), count 2); continuous sexual abuse of a child under 14 years old (§ 288.5, subd. (a), count 3); two counts of forcible rape of a child under 14 years old (§ 261, subd. (a)(2), counts 4 and 5); five counts of forcible oral copulation of a minor under 14 years old (§ 288A, subd. (c)(2)(B), counts 6 through 10); and sexual penetration by foreign object of a child under 14 years old (§ 289, subd. (a)(1)(B), count 11).

A jury trial followed. We summarize the evidence relevant to our resolution of Ramirez Ruiz's appeal.

### I.

### *Testimony of Minor's School Counselor*

A counselor at a Redwood City school where Minor was in sixth grade testified that Minor was born in January 2005, and was a straight A student, and that Minor's mother (Mother) volunteered often at the school. On September 20, 2016, Mother knocked on the counselor's office door and,

---

[1] During the pendency of this appeal, this court ordered that the petition for a writ of habeas corpus also filed by Ramirez Ruiz be considered with this appeal. We are issuing an order summarily denying that petition concurrent with this opinion.

[2] All statutory references are to the Penal Code unless otherwise stated.

appearing "[s]haky and" "worried," and with "a sense of urgency," insisted that she needed to see the counselor. After speaking with Mother,[3] the counselor called for Minor, who soon arrived and talked with the counselor. Minor became "very, very upset" when the counselor said she would have to report what Minor had told her. Minor said repeatedly that "she didn't want her father to go to jail, that she wanted her family to be together, but she wanted it to stop." She left the office "[t]earful; quiet; very, very upset."

The counselor further testified that her relationship with Minor and her Mother changed over time: "We would have really frequent interactions after this for many different reasons. And, lately, there has been a definite shift. Mom isn't interacting with me. [Minor] doesn't seem happy to see me anymore and seems uncomfortable around me."

## II.

### *Minor's Statements to a Social Worker*

Dana Donnelly, a San Mateo County social worker, testified that on the evening of September 20, 2016, she conducted "a check" of Minor at Minor's home after a receiving a report that Minor had been sexually abused.[4] Both parents were present but, as we will discuss, Donnelly interviewed Minor privately in a bedroom with only a co-worker and a deputy sheriff present. In the interview, Minor was "calm and polite" and "seemed relaxed" at first. Her demeanor changed, however, toward the end when she became "visibly

---

[3] The school counselor did not testify about what Mother said.

[4] We discuss other aspects of Donnell's testimony in our discussion of Ramirez Ruiz's confrontation clause claim *post*.

3

upset," her voice "tremble[d] a little bit, and she started crying." She rested her head on Donnelly's shoulder with Donnelly's encouragement.

Unbeknownst to Donnelly, the deputy sheriff present recorded the interview. The recording was played for the jury but is not contained in the record; however, two transcripts are, one presented by the prosecution at trial and one presented by the defense to the court as part of its motion for a new trial.[5]

Both transcripts indicate that Donnelly alone interviewed Minor for a relatively short period of time (each is only five pages long). Donnelly first inquired about the language Minor preferred to converse in (which was English), explained she was a social worker and asked about Minor's home life. She asked Minor if anything had happened that morning and Minor said no. Donnelly then asked, "[H]as anyone ever touched you in a way that made you feel uncomfortable?" Minor said, "Yes," and indicated her father had touched her the previous Friday. The prosecution's transcript states that Minor said her father had touched her "[i]n my private part" with his "private part," and Ramirez Ruiz's transcript indicates she only said her father had touched her "[i]n my pants." In both transcripts, Minor, when asked when was "the first time" it happened, answered, "[l]ike, three months" before, and that "then" she told him she was going to her Mother but he had threatened to hit her if she did. The prosecution's transcript has Minor saying she and her Mother made a deal not to tell Ramirez Ruiz that Donnelly and the others were coming to the house; the defense transcript has her saying she

---

[5] The jury was provided with the prosecution's transcript and was instructed that the recording, not the transcript, was the evidence.

and Ramirez Ruiz made a deal "that we weren't gonna tell or you guys would come."

## III.

### *Detective Lopez's Interrogation of Ramirez Ruiz*

On September 21, 2016, the day after Donnelly's interview of Minor, Detective Lisandro Lopez of the San Mateo County Sheriff's Office interrogated Ramirez Ruiz at a county jail. A video (which is not in the record) and an English-language transcript of the interrogation (which apparently occurred in Spanish) were provided to the jury.

According to the transcript, Ramirez Ruiz, after receiving notice of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, said he had been arrested the previous day because of an outstanding warrant and the suspicion that he had "harassed" Minor. He lived with his wife and Minor in a one-bedroom apartment and had a "normal" relationship with Minor. After a recent change, his wife and Minor slept in the bedroom and he slept in the living room, but they slept in the bedroom together sometimes. He worked some small jobs but did not have steady job, and his wife worked from 8 a.m. until 2 p.m.

Ruiz denied having sex with Minor. The three of them sometimes wrestled on the bed, during which he may have accidentally grabbed Minor's breasts two or three times and perhaps her vagina, and she might have grabbed his penis a couple of times. He was "hardly alone" with Minor because he was the last one to wake up and the last one to get home most of the time. However, one or two times he might have accidentally grabbed her breasts as they played alone. He denied touching Minor's breasts or vagina in the morning after his wife left for work. He never had put his hands inside

5

Minor's underwear or put his hands inside her bra. He never had kissed her vagina or put his penis in it, and she had never sucked his penis.

Lopez testified that he then used a "rouse,"[6] meaning a common police tactic in which the interrogator said something that was not necessarily true to try to "elicit a response" and get the subject to "open up and tell . . . what happened." That is, the transcript of the interrogation indicates that Lopez intimated, with no actual knowledge, that DNA collected from Minor had been found to be Ramirez Ruiz's. In response, Ramirez Ruiz said he had the right to remain silent, to which Lopez responded, "since you . . . don't want to provide your statement, we will have to bring your daughter to court to explain everything," and asked, "Would you . . . be willing to have your daughter there in court explaining, testifying in front of everybody?" Upon further questioning, Ramirez Ruiz said he did not think Minor was a liar and agreed that, as Lopez put it, "things escalated and they started to be more and more." He still denied "penetrating" Minor, but said, "I may have" tried. He said he had put his "hard" penis next to Minor's vagina in an "explosion" of excitement two or three times. He could not recall the first time he had done this. He had wanted to penetrate Minor only once, on a morning less than a month ago. He said he was now telling the truth.

Ramirez Ruiz did not recall anything happening the previous Friday. He thought that his wife once went to shower, leaving him alone on the sofa with Minor, but he said he did not ejaculate. Asked again about the previous Friday, he said he and Minor, who was dressed in shorts, were on the sofa while his wife showered. He touched Minor on her "private part" but did not put his finger inside her. Asked if he had "sucked . . . or licked [Minor's]

---

[6] The reporter's transcript refers to a "rouse," which may have been meant by Lopez as a "ruse."

vagina," Ramirez Ruiz gave a confusing answer, added that Minor "grew up very, too fast," and said that she once "did want to, she did grab my penis" and had grabbed his hand and put it close to her buttock, which he had touched. He had touched her vagina, which he was surprised to find "was a woman's vagina" "with a lot of hair" and "wet." Minor's vagina "ended up being very small for" him and he had an erection, but nothing else occurred on that occasion. Ruiz said he had moved Minor's shorts to the side to see her vagina and that, "[h]onestly," he had licked it, but it is unclear if he meant he did so on that same occasion. Asked when he had licked Minor's vagina, he said it was "one of the first times," and thought it had occurred "[a] few months ago."

Ruiz said he was "trying to tell the truth" and that, rather than being a good father, "maybe, well, I'm one of the worst." He had acted because of "stupidity," and added, "I do know that there's something that I can't, I can't control, I don't know. Well, . . . I don't want to say that it can't be done. . . . It's something that is really hard for me to control." He repeated that he had "never penetrated" Minor or put his fingers inside of her vagina, but said he had touched it, perhaps six months ago. Lopez said Minor said it had started the previous year and Ramirez Ruiz said, "Ah, well, then it might be." He agreed that he had kissed Minor's vagina "at the beginning," just one time. He also agreed with Lopez that it had occurred "last year" and added, "And then after that, all that stopped." When Lopez said that it had stopped "when [Minor] went on Christmas vacation," Ramirez Ruiz said, "Well, yes, all that stopped for a long time" and only started again when they played some "games" again.

Questioned further, Ramirez Ruiz said that Minor had tried to suck his penis once, but that he had prevented it by getting up. He said it was

7

"possible" that he had put his penis in her mouth but he did not remember. He had touched her breasts under her bra and could have put his penis next to her vagina one or two times. He asserted that there had been "just a few times" when they had "passed the limit."

Ramirez Ruiz said that on one occasion he had had "sex" with Minor. When Lopez said that would include penetration, Ramirez Ruiz denied ever penetrating Minor or having sex with her and said Lopez was trying to confuse him. When Lopez said, "Ok. So . . . I know that you've had sexual relations with your daughter. But was it five times or was it only two?" Ramirez Ruiz responded, "Well, it could have been, it could have been two or three times," but then again said he had never penetrated her. Lopez and Ramirez Ruiz argued about what it meant to have sexual relations and what Ramirez Ruiz had said, during which Ramirez Ruiz maintained that he had not had sexual relations or sex with Minor.

## IV.

### *Ramirez Ruiz's Trial Testimony*

At trial, Ramirez Ruiz said he never had deliberately tried to touch Minor's breasts or vagina or seen her vagina. He testified that he had lied in the interrogation to protect her from having to be questioned in court. He suggested his DNA on Minor's bra came from the family's shared laundry hamper.

## V.

### *Forensic and Scientific Evidence*

A family nurse practitioner testified that she conducted a SART[7] examination of Minor on September 21, 2016 the day after the Donnelly

---

[7] "SART" stands for Sexual Assault Response Team. (E.g., *People v. Uribe* (2011) 199 Cal.App.4th 836, 840.)

8

interview.  She identified a "deep notch" in the lower part of Minor's hymen, which was consistent with, but did not conclusively establish, sexual abuse.

Evidence was presented of the scientific testing of swabs of Minor's vagina, her vestibular, vulvar and anal areas, and of her bra.  No sperm was found on the swabs of Minor's vagina or vestibular, vulvar and anal areas.  A stained area of the bra tested positive for acid phosphatase, an enzyme found in high concentrations in semen and in low concentrations in other bodily fluids.  Semen was not detected in a microscope search of the stain.  However, further testing of a cutting from this stain indicated a "faint positive" for the protein component in seminal fluid, in which semen travels, thereby confirming the presence of seminal fluid.

The cutting from the bra was further tested by a DNA specialist, who determined that the DNA found on it was a mixture of at least two individuals, which could have included Minor's DNA, and that the mixture included a small amount of male DNA.  A swab from Minor's right breast was also tested.  It was found to have a mixture of DNA from at least two individuals that also could have included Minor's DNA, and included a possible low-level amount of male DNA.  There was no male DNA detected on the vaginal swabs.  Another specialist conducted further testing on the DNA found on the bra cutting and right breast swab.  A male profile matched to Ramirez Ruiz was determined for the DNA on the right breast swab.  Three male profiles were determined to exist for the DNA found on the bra cutting, and Ramirez Ruiz was identified as the major contributor.

## VI.

### *Other Evidence*

The prosecution introduced Spanish-language recordings of jail calls between Ramirez Ruiz and his brothers in which Ramirez Ruiz referred to

9

"washing the stone" and discussed his brothers' contacting family members, although the parties disagree over which family members were discussed. The prosecution contended these calls were evidence of Ramirez Ruiz's efforts to discourage his wife and daughter from cooperating with authorities and testifying at trial. The defense denied these contentions. Ramirez Ruiz's brother, Victor Ruiz, testified that Ramirez Ruiz did not ask him to talk to Mother or Minor. Ramirez Ruiz testified that he did not tell his brothers to ask Mother or Minor to change their accounts or refuse to testify.

Also, the prosecution presented the testimony of a Child Sexual Abuse Accommodation Syndrome ("CSAAS") expert, who testified about the behaviors of child victims of sexual abuse.

## VII.

### *Verdict, Sentencing and Appeal*

After the close of evidence, the court dismissed eight of the eleven counts filed against Ramirez Ruiz. The jury considered only whether to convict Ramirez Ruiz of one count each of oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd.(b), count 2); continuous sexual abuse of a child under 14 years old (§ 288.5, subd. (a), count 3); and forcible rape of a *child* under 14 years old on or about September 16, 2016 (§ 261, subd. (a)(2), count 5). It convicted Ramirez Ruiz of all three counts.

The court sentenced Ramirez Ruiz to 44 years to life in state prison. This consisted of 15 years to life for count 2, an upper term of 16 years for count 3 and an upper term of 13 years for count 5.

Ramirez Ruiz filed a timely notice of appeal. His notice lists as the date of the order or judgment appealed from the date the court both denied his motion for a new trial and sentenced him, but also indicates in

10

section 2(b) that his appeal, rather than being "after" "a jury or court trial" or "a contested violation of probation, is "Other," after which is written, "denial of new trial motion." He asserts he is appealing from his conviction, and the People do not argue otherwise. Because Ramirez Ruiz may well have been merely indicating in his notice of appeal that he was appealing *after* his motion for a new trial (the term used in the other two subsections of section 2(b)), we liberally construe the notice as from his convictions. (*In re Joshua S.* (2007) 41 Cal.4th 261, 272 [" 'notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced' "].) Whatever the scope of his notice, he raised his confrontation clause and corpus delicti rule claims in his new trial motion.

## DISCUSSION

We now address Ramirez Ruiz's appellate claims.

### I.

### *Ramirez Ruiz's Confrontation Clause Claim*

Ramirez Ruiz argues we must reverse his convictions because the trial court violated his confrontation clause rights by admitting into evidence Minor's out-of-court statements to Donnelly and, related to this, by denying his motions for a mistrial and a new trial, which he based on this same violation. He contends the court violated his confrontation clause rights because Minor's statements were testimonial, she was unavailable to testify at trial and was never subject to cross-examination, and admission of her statements to Donnelly violated his Sixth Amendment rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny. We conclude

11

the trial court did not err because Minor's out-of-court statements to Donnelly were not testimonial.

## A. Additional Proceedings Below

### 1. *Events on the Eve of Trial*

Minor initially made out-of-court statements, including to San Mateo County social worker Dana Donnelly, indicating that Ramirez Ruiz had committed certain sex acts with her. According to a defense motion in limine regarding Minor's out-of-court statements, she later told a defense investigator that she had lied to police when she had said Ramirez Ruiz had molested her. On the eve of trial, after an in-chambers discussion with Minor and counsel in which Minor said nothing had happened, that her previous statements in a forensic interview were not true, that she did not want to testify in front of people about her family issues and that no one was asking her not to testify, the trial court found she was refusing to testify and ruled that she was unavailable to testify. The court also ruled separately that Mother had a privilege not to testify.

The record does not contain a written motion by the defense to specifically exclude Minor's statements to Donnelly,[8] but the relevant hearing transcript indicates that defense counsel moved to exclude it and the court reviewed a transcript of Minor's statements to Donnelly (presumably the transcript that was admitted at trial) and a "police report" prior to the hearing. At the hearing, the court commented that the reporting officer indicated the visit to Minor's home was a welfare check. The court ruled that Doe's statements to Donnelly would be admitted under Evidence Code section 1360 as a statement describing child abuse made by a child under the

---

[8] Ramirez Ruiz contends he sought to exclude Minor's statements to Donnelly in the defense motion in limine on her out-of-court statements, but it does not refer to those statements.

age of 12.  These and the statements to her school counselor that we have summarized were the only out of court statements by Minor that were admitted into evidence at trial.

## 2. *Donnelly's and Piper's Testimony About Minor's Statements*

Donnelly testified that she worked with "all sorts of clients, mainly mothers, and fathers, and their children."  Asked what she did for work on a "day-to-day basis," she replied, "So I have to respond to emergency reports that we receive.  I have to go out and investigate to see if child abuse or neglect has occurred."  She further explained, "I typically meet with the child first, and I complete what we call a comprehensive interview.  I kind of gauge—get to know the child a little bit and ask them specific questions.  And, from there, after meeting with the child, I meet with the parents.  And, if needed, we safety plan . . . ."

Donnelly further testified that on the night of September 20, 2016, she conducted "a check" of Minor after receiving a report that Minor had been sexually abused.  She arrived at Minor's home, a second-story apartment in Redwood City, California, at approximately 10:15 p.m., accompanied by a co-worker serving as a Spanish translator, a sergeant from the sheriff's department and a sheriff's deputy, Judson Piper.  They knocked on the home's door and Ramirez Ruiz opened it.  Donnelly explained who she was, her role and that "we had received a report."  She asked permission to enter the home and meet with Minor "to assess her safety."  Ramirez Ruiz allowed entry, and Donnelly, her co-worker and Deputy Piper went inside, where they found Ramirez Ruiz's wife and Minor.

Donnelly received permission to speak to Minor privately.  She introduced herself to Minor, explained Minor was not in trouble and asked to see her room.  Minor took Donnelly, the co-worker and Deputy Piper to her

13

bedroom.  Donnelly, with Minor's permission, sat on the left side of the bed with Minor, the co-worker sat on the right side and Deputy Piper stood "closer to the door."  Minor's co-worker did not participate in the interview after Minor indicated she would prefer to talk in English and Deputy Piper did not ask questions.  Donnelly said she interviewed Minor "[t]o assess her safety and to determine whether she was currently safe or not," and that she thought there "[a]bsolutely" was a safety risk to Minor at that time.  She had no idea the interview was being recorded.

Deputy Piper testified that he recorded Donnelly's interview of Minor with a digital recorder he kept in his pocket, which began recording when Ramirez Ruiz opened the apartment door.  Asked why he recorded, he said, "Just to record the welfare check itself, because I wasn't sure what was going to come of it . . . ."  Asked to explain further, he said, "In case something came of it because welfare checks sometimes turn into something else," and agreed that an example would be a "court case."  He said he did not tell anyone, and did not believe Minor knew, that he was recording.

### 3.  *Ramirez Ruiz's Motion for a Mistrial*

After Donnelly and Piper testified, Ramirez Ruiz's counsel moved for a mistrial, arguing that Piper's reason for recording included because "these things sometimes get into something further," "such as prosecution."  Defense counsel contended Piper's intent made Minor's statements testamentary, renewed an objection to the admission of Minor's recorded statements to Donnelly and moved for a mistrial.  The court overruled the objection and denied the motion, stating, "There were a number of factors that went into my findings that it was not testimonial.  That is relevant to one of those factors, but there are so many other factors that make it clear to me that it is not that my ruling will stand on that."

14

### 4. *Ramirez Ruiz's Motion for New Trial*

After trial and before sentencing, Ramirez Ruiz filed a motion for a new trial, in part on the ground that the court's admission into evidence of Minor's recorded statements to Donnelly violated *Crawford* and its progeny (he also moved for a new trial based on the corpus delicti doctrine, which we discuss *post*). Ramirez Ruiz submitted to the court a transcript of Minor's statements prepared by defense counsel that differed with the transcript submitted to the jury, which differences we have already discussed. In his supporting brief, he contended that another talk with Minor was conducted by Deputy Piper, with Donnelly helping, after Donnelly interviewed Minor and talked to Mother. Ramirez Ruiz stated, "Piper instructed Donnelly to 'ask [Minor] if she has any of the clothing that she was wearing . . . and if it's been washed or not, and if not, ask where is it, so we can collect it.' Donnelly then asked [Minor] about clothing. [Minor] said that she was wearing a pink shirt and blue shorts but that they had washed them already. Donnelly asked Piper if he still wanted the clothes if they had been washed. Piper replied 'no.' Donnelly asked [Minor] what part of the living room the incident had taken place and [Minor] said the couch. Piper then took over the interview and asked [Minor] which part of the couch the incident occurred, and [Minor] identified the corresponding [part] of the couch. Donnelly then explained to [Minor] that they were going to take her to the hospital for an examination. Piper then instructed Donnelly to ask [Minor] whether defendant was clothed during the incident. In response to Donnelly's questioning, [Minor] replied that she and defendant were clothed, that defendant had his 'private area' outside of his clothes, and that defendant took off her shorts while she was sitting on the couch. Piper directly asked some of the questions as well."

After hearing oral argument, the court denied Ramirez Ruiz's motion for a new trial. It stated, "[W]e did exhaustively litigate this matter during the course of the trial. I made findings at the time that I still believe are accurate. I believe that things like the recording being on is certainly not determinative. Recordings are used in all different types of cases now. . . . [¶] I think the questions that were asked by [Donnelly] were non-testimonial. I think she was asking questions to determine the level of danger. This was to a child. This was in a home. This was not a law enforcement officer asking the questions. [¶] My conclusion at the time that I admitted this evidence was that it was non-testimonial. That is still my conclusion." The court added that the recording of Minor's statements, not any transcript, was the evidence and that the defense transcript did "not reflect the defendant's interpretation of the language used in answer to the questions by [Donnelly]."

**B. Legal Standards**

In *Crawford*, the United States Supreme Court held that the admission into evidence at trial of an otherwise admissible "testimonial" hearsay statement of a declarant who is unavailable to testify violates the confrontation clause of the federal Constitution unless the defendant has had a prior opportunity to cross-examine the declarant. (*Crawford*, *supra*, 541 U.S. at pp. 59, 68.) The *Crawford* court declined to give a comprehensive definition of "testimonial," stating only that it "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.)

The Supreme Court revisited what was "testimonial" in *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), which addressed two cases, *Davis v. Washington* and *Hammon v. Indiana*. The court differentiated between statements made to respond to an ongoing emergency and statements made

16

to establish or prove past events relevant to a later criminal prosecution (*id.* at p. 822); among other things, it considered the formality of the circumstances, or lack thereof, to be "essential." (*Id.* at p. 830, fn. 5.)

Regarding *Davis v. Washington*, the court held that a recording of an alleged domestic violence victim's 911 call, in which she reported events as they were actually happening, was non-testimonial because she faced an "ongoing emergency" at the time and her "frantic" call "in an environment that was not tranquil" was "plainly . . . for help against a bona fide physical threat." (*Davis*, *supra*, 547 U.S. at p. 827.) The 911 operator's questioning "elicited statements [that] were necessary to be able to *resolve* the present emergency," including learning the identity of the suspect, "so that the dispatched officers might know whether they would be encountering a violent felon." (*Ibid.*) Under these circumstances, the declarant "simply was not acting as a *witness*; she was not *testifying*." (*Id.* at p. 828.)

As for *Hammon v. Indiana*, the court held that an alleged domestic violence victim's statements to a police officer in her living room while a second officer confined the suspect in the kitchen were testimonial. The court noted that the officers had responded to a domestic disturbance report to find the alleged victim alone on her front porch, where she told them nothing was wrong. (*Davis*, *supra*, 547 U.S. at p. 819.) During the subsequent interview in her living room, she said the suspect had physically abused her, and the interviewing officer had her fill out and sign a battery affidavit. (*Id.* at p. 820.) In holding that the alleged victim's oral and written statements were testimonial, the court noted she made them when "there was no immediate threat to [her] person," and that the questioning officer was not seeking to determine " 'what is happening,' " but rather " 'what happened.' " (*Id.* at pp. 829-830.) The court considered the declarant's statements were "formal

17

enough" because she and the suspect were physically separated, the police questioned the declarant about past events and the interview "took place some time after the events described were over." (*Id*. at p. 830.)

The Supreme Court further clarified what constituted "testimonial" statements in subsequent cases. In *Michigan v. Bryant* (2011) 562 U.S. 344, police responding to a report of a shooting found a man shot in the abdomen lying on the ground by his car in a gas station parking lot around 3:25 a.m., in great pain and able to speak only with difficulty. (*Id*. at p. 349.) The officers asked him what had happened, who had shot him, and where the shooting had occurred. (*Ibid*.) The victim answered their questions in a conversation that ended in 5 to 10 minutes when medical services arrived. (*Ibid*.) He died within hours. (*Ibid*.) The court concluded his statements were not testimonial because he made them during an ongoing emergency, speaking "within the first few minutes of the police officers' arrival and well before they secured the scene of the shooting—the shooter's last known location." (*Id*. at p. 374.) Furthermore, the shooter's whereabouts and motive were unknown and, thus, the officers had "no reason to think that the shooter would not shoot again if he arrived on the scene" (*id*. at p. 377), and the victim's physical distress suggested he did not give his statement with the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution (*id*. at p. 375). Also, "the questioning . . . occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion" (*id*. at p. 366), and the questions the officers asked "were the exact type of questions necessary to allow the police ' "to

assess the situation, the threat to their own safety, and possible danger to the potential victim" ' and to the public" (*id.* at p. 376).

In *Ohio v. Clark* (2015) 576 U.S. 237 (*Clark*), the Supreme Court held that statements by a three-year-old child to his preschool teachers identifying the defendant as his abuser were not testimonial because the primary purpose of these discussions was to determine if it was safe to return the child to his guardian. (*Id.* at pp. 246-247.) The court instructed that whether or not a statement is made to quell an immediate emergency is relevant, but not necessarily determinative; rather, the focus should be on whether the statement's "primary purpose" is testimonial. (*Id.* at pp. 244-246.) It concluded the child's statements, occurring "in the context of an ongoing emergency involving suspected child abuse," and to teachers, not officers, "clearly were not made with the primary purposes of creating evidence for [the defendant's] prosecution." (*Id.* at p. 246.) "On the contrary, it is clear that the first objective was to protect" the child, and "the conversation . . . was informal and spontaneous. The teachers asked [the child] about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom . . . ." (*Id.* at p. 247.)

The California Supreme Court, based on *Crawford* and related cases, has given guidance to our courts regarding how to determine whether a statement is testimonial. When police are involved, the court has instructed that we must evaluate the circumstances and the statements and actions of the parties to determine "the *primary* purpose of both officer and declarant" based objectively on " 'the purpose that reasonable participants would have had.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 813-814 (*Blacksher*).) Furthermore, we "should consider whether an ' "ongoing emergency" ' exists, or appears to exist, when the statement was made," even "if hindsight reveals

19

that an emergency did not, in fact, exist." (*Id*. at p. 814.) "Whether an ongoing emergency exists is a 'highly context-dependent inquiry' " that may take into account whether the victim, first responders, or the public remain at risk. (*Ibid*.) Also, "regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations." (*Id*. at p. 815; see also *People v. Sanchez* (2016) 63 Cal.4th 665, 689 ["[t]estimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony" while nontestimonial statements "are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial"].)

Where, as here, the defendant made contemporaneous objections during trial, the prosecution, "as the proponent of the evidence, . . . had the burden to show the challenged testimony did not relate testimonial hearsay." (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 584, citing *United States v. Jackson* (5th Cir. 2011) 636 F.3d 687, 695 ["the government bears the burden of defeating [defendant's] properly raised Confrontation Clause objection by establishing that its evidence is nontestimonial"].)

On appeal, we independently review whether a statement was testimonial, implicating the constitutional right of confrontation. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.) We review a court's ruling on a motion for a new trial "under a deferential abuse of discretion standard," which, regarding a constitutional claim, means "the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights." (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27, overruled in part on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)

### C. Analysis

We conclude that the trial court did not violate Ramirez Ruiz's confrontation clause rights by admitting Minor's statements to Donnelly because, as in *Clark*, Donnelly's primary purpose in interviewing Minor was to assess the child's safety and Minor's primary purpose in responding was to stop the abuse she was experiencing.

Donnelly was a social worker, not a law enforcement officer or trained forensic interviewer, and her daily responsibilities included responding to emergencies to assess the safety of possible victims of abuse. In her unchallenged testimony, she said she visited Minor's home late in the evening on the day she received a report of possible abuse, and that she did so to assess Minor's safety. Donnelly explained to Minor at the beginning of the interview that her purpose was to assess Minor's safety. Minor had earlier in the day told her school counselor that she wanted "it" to stop and that she did not want her father to go to jail. Considered objectively, her statements that day, including to Donnelly were consistent with her desire for safety and inconsistent with a purpose of providing evidence to prosecute her father.

Furthermore, the interview was informal and brief, consistent with a welfare check and not with a criminal investigation. Donnelly talked with Minor while sitting on her bed with her, asked a few questions about possible abuse, did not ask about or probe for information regarding all the abuse Minor might have suffered and comforted Minor when she became upset. Donnelly ended the interview as soon as Minor told her about continued abuse (Minor's indication that Ramirez Ruiz had repeatedly raped her), saying "I think we have enough." Under the circumstances, Donnelly's statement did not mean she was there to pursue a criminal prosecution, as

21

Ramirez Ruiz implies. Rather, interpreted in the context of this very brief interchange, the statement can only reasonably be understood as indicating they had enough to conclude that Minor was not in a safe situation.

Further indicating the purpose of Donnelly's interview was to assess Minor's safety was the fact that only she asked questions of Minor in that part of the interview. The law enforcement officer present, Deputy Piper, did not play any active role at that point, and his placement nearer to the bedroom door indicates his role was to protect Donnelly and Minor as they talked. As the Supreme Court observed in *Clark* regarding teachers' inquiries to a possibly abused child, "This was nothing like the formalized station-house questioning in *Crawford* or the police interrogation and battery affidavit in *Hammon*." (*Clark*, *supra*, 576 U.S. at p. 247.) As in *Clark*, this evidence indicates that Donnelly was responding as soon as possible to a situation in which Minor was at risk of continued sexual abuse. A further indication that Donnelly's interview of Minor was not in preparation for a criminal prosecution is that Minor was interviewed the next day by a forensic interviewer (her statements to that interviewer were not admitted into evidence).

We are troubled by the fact that Deputy Piper recorded Donnelly's interview of Minor and we do not condone such conduct on the part of law enforcement officials accompanying child welfare workers on a welfare check. Recording an interview tends to indicate the interview has a testimonial purpose and, in many circumstances, will result in exclusion of the recorded statements. If the social worker had understood in advance that the deputy planned to record the interview or even had she been aware he was recording while she was interviewing the Minor, the outcome might be different. If the circumstances otherwise indicate an implicit agreement between child

22

welfare workers and law enforcement officials to conduct an interview for dual purposes, admission of such an interview would implicate a defendant's Sixth Amendment rights.

Under the specific facts presented here, however, Deputy Piper's surreptitious recording does not change our objective determination of the primary purpose of Donnelly's initial and brief interview of Minor and Minor's participation in it. Our Supreme Court has instructed that we consider the primary purposes of the questioner and the alleged victim in evaluating the purpose of their statements. (*Blacksher*, *supra,* 52 Cal.4th at pp. 813-814.) The possibly different purpose of another witness is, to be sure, a part of the context in which we must evaluate whether the statements are testimonial. Here, the officer's recording of the interview does not tip the balance to render Minor's statements testimonial. We so conclude because the other evidence shows that the questioner, Donnelly, and the Minor were engaged in an interview for purposes that did not involve creating a record for any kind of trial and that they were unaware of the recording. As far as they knew, Piper was simply standing near the door so they could safely engage in a private conversation. Piper's presence, which in context reasonably would have been understood as ensuring the safety and security of the social worker and the Minor, did not convert Donnelly's brief interview of the Minor into a criminal investigation.

Ramirez Ruiz contends that Donnelly's interview was more like the home interview discussed in the *Hammon* part of *Davis*, which the Supreme Court held was testimonial. We disagree. There, police only interviewed the victim after she told them there was nothing wrong as she sat alone on her porch, which could be reasonably viewed as indicating there was no ongoing emergency. Furthermore, although the interview occurred in her home with

23

the defendant present, it was conducted by law enforcement officers who had her complete and sign a battery affidavit. These factual circumstances matter greatly; the *Davis* court emphasized that its holding regarding *Hammon* did not establish a blanket rule regarding statements to police called to investigate a potential crime scene. (*Davis, supra,* 547 U.S. at p. 832.) Indeed, the court noted, "exigencies," such as officers' " 'need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim' " "may *often* mean that 'initial inquiries' produce nontestimonial statements." (*Ibid.*) Such exigencies existed when Donnelly interviewed Minor.

Ramirez Ruiz also relies on *People v. Sisavath* (2004) 118 Cal.App.4th 1396 to argue that Minor's statements to Donnelly were testimonial. There, the appellate court held it was reasonable to conclude that the alleged victim's statements to a " 'forensic interview specialist' " would be available for use in a criminal prosecution. (*Id.* at p. 1402.) The case is not on point. It involved an interview similar to the forensic interview of Minor conducted at the Keller Center the day after Minor spoke with Donnelly, not the kind of initial safety-related interview at issue here.

In short, here, a nighttime welfare check of a Minor in the custody of a father who, it was reported earlier that day, could be sexually abusing her, conducted by a social worker charged with responding to emergency reports to assess potential victims' safety, is a much different circumstance than those discussed in the cases cited by Ramirez Ruiz. There are no objective indications in the record that Donnelly was conducting an investigation for a potential criminal prosecution or that Minor spoke to Donnelly with that

24

purpose in mind. The court did not err by admitting Minor's recorded statements and denying Ramirez Ruiz's motion for a mistrial.

Ramirez Ruiz's motion for new trial was similarly unpersuasive. Although his counsel contended in a supporting brief that Deputy Piper took the lead in a second interview with Minor some minutes after the Donnelly interview, counsel did not present evidence of that later interview, so the contention added nothing to the argument. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11 [stating, "the unsworn statements of counsel are not evidence" regarding facts asserted in a brief].) Regardless, that Donnelly's interview might have led to further questioning by Deputy Piper after Donnelly had concluded she had enough information to evaluate whether Minor was safe does not alter our conclusion. "A nontestimonial encounter addressing an emergency may evolve, converting subsequent statements into testimonial ones." (*Blacksher*, *supra*, 52 Cal.4th at p. 814; see also *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1593 [" 'a conversation which begins as an interrogation to determine the need for emergency assistance' can " ' "evolve into testimonial statements" ' "], quoting *Davis*, *supra*, 547 U.S. at p. 828].) The trial court did not abuse its discretion in denying the part of Ramirez Ruiz's motion for a new trial that was based on *Crawford*.[9]

## II.

### Ramirez Ruiz's Corpus Delicti Claim

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively*

---

[9] Having concluded that Ramirez Ruiz's claims are meritless, we do not address the parties' arguments regarding whether any error was prejudicial.

25

upon the extrajudicial statements, confessions, or admissions of the defendant"; "some independent proof of the corpus delicti" is required. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).) Ramirez Ruiz argues that, even if Minor's statements to Donnelly were properly admitted, there was insufficient evidence of the corpus delicti to support any of his convictions and that the court's arbitrary disregard of the corpus delicti requirement violated his due process rights under the federal Constitution. We disagree that there was insufficient independent evidence to support his convictions on counts 3 and 5 for continuous sexual abuse and forcible rape, respectively, of a minor under 14 years old (§§ 288.5, subd. (a), 261, subd. (a)(2)). However, we agree there was insufficient independent evidence to support his conviction on count 2, for oral copulation or sexual intercourse with a child 10 years old or younger (§ 288.7, subd. (a)). We therefore reverse the latter conviction.

## A. Additional Proceedings Below

Near the end of the trial, Ramirez Ruiz filed a motion for judgment of acquittal under section 1118.1[10] regarding counts one and two, which the prosecution opposed. After the parties finished presenting evidence, defense counsel orally moved in chambers for the dismissal of all counts. The court indicated it was going to dismiss all but counts 2, 3 and 5. Thereafter, in open court, outside the presence of the jury, defense counsel argued there was no proof of the corpus delicti independent of Ramirez Ruiz's statements to

---

[10] Section 1118.1 states in relevant part, "In a case tried before a jury, the court on motion of the defendant . . . , at the close of the evidence on either side . . . shall order the entry of a judgment of acquittal of one or more of the offenses charged . . . if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

Detective Lopez regarding count 2. The prosecution argued there was sufficient evidence.

The trial court denied the motion regarding count 2. It stated, "We certainly did discuss this at length and in chambers. Based on the case cited by counsel as well as other cases that were before the court, in this context of sexual assault, corpus is broadly defined in terms of the physical act. And all elements of . . . a crime do not have to be shown in the evidence apart from defendant's confession. [¶] So I am finding corpus sufficient. I did not find corpus sufficient for count 1. But I did find corpus sufficient for count 2."

In his closing argument, defense counsel argued the jury should acquit Ramirez Ruiz for lack of evidence independent of Ramirez Ruiz's own statements that supported certain elements of the charged offenses. On rebuttal, the prosecutor contended there was additional evidence, such as Minor's recorded statement to Donnelly, the medical exam showing a deep notch in Minor's hymen consistent with sexual abuse, and the evidence of Ramirez Ruiz's seminal fluid on Minor's bra and his DNA on a swab of Minor's breast.

The trial court instructed the jury with CALCRIM No. 359, which states in relevant part, "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime or a lesser included offense was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime. If other evidence shows that the charged

27

crime or a lesser included offense was committed, the identity of the person who committed it may be proved by the defendant's statements alone."

Ramirez Ruiz raised his corpus delicti claims again in his motion for new trial (in addition to his *Crawford* claim). After hearing argument, the trial court again rejected these claims, finding "sufficient, independent evidence of corpus to support each of the offenses."

## B. Legal Standards

As we have discussed, "the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause," and "cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant"; "some independent proof of the corpus delicti" is required. (*Alvarez, supra,* 27 Cal.4th at pp. 1168-1169.) Although the part of the common law corpus delicti rule excluding unsupported extrajudicial statements from evidence was abrogated by article I, section 28, subdivision (d) of the California Constitution, the part requiring some independent proof of the corpus delicti to convict a defendant who makes an incriminating statement remains in force "to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Alvarez,* at pp. 1165, 1169.) In other words, as a result of this partial abrogation, the evidence of unsupported extrajudicial statements is now admissible, but conviction still requires independent proof of the corpus delicti.

As reflected in CALCRIM No. 359, " ' "[a] slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient" ' " to satisfy the corpus delicti rule. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1127-1128.) "The independent proof may be circumstantial

28

and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency." (*Alvarez*, *supra*, 27 Cal.4th at p. 1171; see also *People v. Sanchez* (2016) 246 Cal.App.4th 167 [circumstantial evidence of criminal activity satisfies the corpus delicti rule].)

We review the evidence to determine if this "'slight or prima facie standard" has been met. (*People v. Jennings* (1991) 53 Cal.3d 334, 368 (*Jennings*).) As we have discussed, we generally review the court's ruling on a motion for a new trial under a deferential abuse of discretion standard, but we independently review for legal error. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859-860.)

### B. Analysis

We agree with the People that there was sufficient evidence of the corpus delicti to convict Ramirez Ruiz of counts 3 and 5.

Regarding count 3, continuous sexual abuse of a minor under 14 years old, section 288.5, subdivision (a) states, "Any person who . . . resides in the same home with the minor child . . . , who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child . . . ."

29

Regarding count 5, forcible rape of a child under 14 years old on or about September 16, 2016, section 261, subdivision (a)(2) defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another."

According to the evidence presented to the jury, Minor, who was 11 years old at all relevant times, told Donnelly that Ramirez Ruiz had put his "private part" in her "private part" the previous Friday and, when asked when was the first time it happened, answered, "[l]ike, three months" before, and that "then" she told him she was going to her Mother but he had threatened to hit her if she did.  Furthermore, a medical examination found a "deep notch" in Minor's hymen, the presence of which was consistent with sexual abuse, even though this notch did not establish conclusively that sexual abuse had occurred.  Also, Ramirez Ruiz's seminal fluid was found on Minor's bra.  This evidence was sufficient to establish the corpus delicti regarding both counts three and five.  Certainly, it was evidence that Ramirez Ruiz had forcibly raped Minor the previous Friday under threat of physically harming her, satisfying the requirements of count 5.  The evidence was not as clear regarding count 3 because Minor specifically referred to only two incidents of abuse in her statements to Donnelly, not the three required by section 288.5, subdivision (a).  However, as the People point out, two California Supreme Court cases show how slight the evidence may be and still satisfy the corpus delicti rule.

In *People v. Jones* (1998) 17 Cal.4th 279, the court considered whether there was corpus delicti evidence that supported an oral copulation charge. (*Id*. at p. 302.)  The victim was found dying from a gunshot wound to the

head.  (*Ibid*.)  Medical experts "found bruises on her thighs, knees, legs, and perineal area," injuries on her hands, and semen inside her vagina, on her external genitalia, and in her rectal area.  (*Ibid*.)  "No trace of semen was found in [the victim's] mouth; an expert testified, however, that negative test results were not inconsistent with oral copulation because the mouth's natural rinsing processes eliminate semen."  (*Ibid*.)  Also, the victim was not wearing underpants or a brassiere, which she customarily wore.  (*Ibid*.)  Our Supreme Court rejected the defendant's claim that there was insufficient corpus delicti evidence because the corpus delicti rule does not require "independent evidence of every physical act constituting an element of an offense . . . .  Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved."  (*Id*. at p. 303.)

In *Jennings*, *supra*, 53 Cal.3d 334, our Supreme Court rejected the defendant's argument that the prosecution had failed to establish the corpus delicti of rape although "the evidence of rape was not strong."  (*Id*. at p. 367.)  No seminal fluids were found on the victim's body, no evidence of penetration existed, and there was "no evidence that the victim's clothes were arranged in such a manner as to suggest a sexual assault."  (*Ibid*.)  Nonetheless, the court held the corpus delicti of rape was established based on evidence that the victim's body was found unclothed in a remote site with a broken jaw.  (*Id*. at pp. 367-368.)  The court reasoned that the location and condition of the body gave rise to an inference "that some sexual activity occurred" and "whatever sexual activity occurred, it occurred against the victim's will."  (*Ibid*.)

Based on these cases, we conclude it can be reasonably inferred from evidence independent of his confession that Ramirez Ruiz had committed at least three acts of sexual abuse, as defined under section 288.5,

subdivision (a), in the previous three months.  Specifically, Minor's statements that Ramirez Ruiz had penetrated her private part with his own the previous Friday and had first done so three months earlier, coupled with the evidence of seminal fluid and semen found on Minor and her clothing, some of which could be identified as that of Ramirez Ruiz,  is sufficient evidence of the corpus delicti of the crime of continuous sexual abuse of a child under 14.  Therefore, the court did not err in denying the motion to dismiss or the new trial motion in regard to count 3 and count 5.

However, we agree with Ramirez Ruiz that there was insufficient corpus delicti evidence to support count two, which alleged that Ramirez Ruiz had engaged in oral copulation or sexual penetration with a child 10 years old or younger in violation of section 288.7, subd.(b).  Minor turned 11 in January 2016.  In September 2016, she told Donnelly her father had first penetrated her private part with his own "[l]ike, three months" before, meaning sometime around June 20, 2016.  This date was almost five months after her 11th birthday.  Neither Minor's testimony nor any other evidence independent of Ramirez Ruiz's confession indicates that Ramirez Ruiz engaged in any sex act with Minor before her 11th birthday.  The only evidence that he did so consisted of his own statements to Detective Lopez indicating that he had kissed Minor's vagina "at the beginning," just one time, and agreed with Lopez that it had occurred "last year" and stopped "when [Minor] went on Christmas vacation."

Although, as we have discussed, corpus delicti evidence can be quite slight, we think it a bridge too far to hold that corpus delicti evidence of sexual abuse identified by the victim as beginning around a particular time supports the inference that a sexual assault of a different kind occurred more than five months earlier.  None of the cases cited by the People support such

32

a holding.  (See *People v. Jones*, *supra*, 17 Cal.4th 279; *Jennings*, *supra*, 53 Cal.3d 334; *People v. Tompkins* (2010) 185 Cal.App.4th 1253, 1260 ["separate evidence is not required as to each individual count to establish the corpus delicti"]; *People v. Culton* (1992) 11 Cal.App.4th 363, 372-373 [pediatrician's testimony regarding abnormalities consistent with sexual abuse sufficient to support 10 lewd act charges].)  We conclude that we must reverse count two for failure of the prosecution to present any evidence of the corpus delicti.  The trial court erred when it concluded otherwise and abused its discretion when it denied Ramirez Ruiz's motion for a new trial on this issue.

## DISPOSITION

The rulings appealed from are affirmed, except that we reverse Ramirez Ruiz's conviction for count two, for oral copulation or sexual intercourse with a child 10 years old or younger (§ 288.7, subd. (a)).  We remand with instructions to the trial court to prepare an amended abstract of judgment and send a copy of it to the California Department of Corrections and Rehabilitation.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*People v. Ramirez Ruiz* (A153135)

Trial Court:San Mateo County Superior Court

Trial Judge:      Hon. John L. Grandsaert

Counsel:

Law Offices of Beles & Beles, Robert J. Beles, Paul G. McCarthy, and Joseph L. Ryan for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Leif M. Dautch, Deputy Attorneys General for Plaintiff and Respondent.